2025 IL App (4th) 230662

NO. 4-23-0662

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| GUNS SAVE LIFE, INC., | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| BRENDAN KELLY, in His Official Capacity as Acting | ) | No. 19CH180 |
| Director of the Illinois State Police, | ) | |
|     Defendant-Appellee. | ) | Honorable |
| | ) | Jennifer M. Ascher, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justice Cavanagh concurred in the judgment and opinion.
Justice Cavanagh also specially concurred, with opinion.
Justice DeArmond dissented, with opinion.

**OPINION**

¶ 1 The Firearm Owners Identification Card Act (FOID Act) (430 ILCS 65/0.01 *et seq.* (West 2022)) establishes a licensing system for the acquisition and possession of firearms in Illinois. Plaintiff, Guns Save Life, Inc. (GSL), brought an action challenging the constitutionality of the FOID Act under the second amendment to the United States Constitution (U.S. Const., amend. II). Ultimately, GSL and defendant, Brendan Kelly, in his official capacity as acting director of the Illinois State Police, filed cross-motions for summary judgment. In July 2023, the trial court granted defendant's motion, denied GSL's motion, and entered a final judgment in defendant's favor. GSL appeals, arguing (1) the FOID Act violates the second amendment by requiring a license to own a firearm and (2) the fees imposed by the FOID Act are unconstitutional

under the second amendment. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3         The purpose of the FOID Act is "to promote and protect the health, safety and welfare of the public" by establishing a system through which persons who are prohibited from acquiring and possessing firearms, firearm ammunition, stun guns, and Tasers can be identified by law enforcement. 430 ILCS 65/1 (West 2022). The FOID Act provides that, with certain specified exceptions, no person may acquire or possess any firearm, stun gun, Taser, or firearm ammunition within the State without possessing a FOID card issued by the Illinois State Police. *Id.* § 2(a).

¶ 4         Specific objective criteria must be satisfied for the issuance of a FOID card, including criteria related to an applicant's age, criminal history, drug dependency, mental-health history and status, intellectual functioning, and citizenship and residency status. *Id.* §§ 4, 8. "The Illinois State Police *shall* either approve or deny all applications within 30 days from the date they are received," and "every applicant found qualified *** *shall* be entitled to a [FOID card] upon the payment of a $10 fee and applicable processing fees." (Emphases added.) *Id.* § 5. Qualified applicants are those who satisfy the FOID Act's specified criteria. See *Id.* §§ 4, 8. For example, the Illinois State Police may deny a FOID card application where an applicant is under 21, is not in the military, and lacks consent of a parent or guardian (*id.* § 8(b-5)); has been convicted of a felony (*id.* § 8(c)) or other specified offense involving violence or domestic abuse (*id.* § 8(k), (*l*)); is addicted to narcotics (*id.* § 8(d)); has been adjudicated as a person with a mental disability (*id.* § 8(r)), involuntarily admitted to a mental health facility (*id.* § 8(t)), or a patient of a mental health facility within the past five years (*id.* § 8(e)); or has an intellectual disability (*id.* § 8(g)). The FOID Act also contains procedures for challenging the denial of a FOID card application. *Id.* § 10.

¶ 5         On May 15, 2019, GSL filed the underlying action for declaratory and injunctive

relief, describing itself as "an independent not-for-profit organization dedicated to defending the Second Amendment rights of Illinois residents." In addition to defendant Kelly, GSL also named Illinois Attorney General Kwame Raoul as a defendant in the action. GSL's four-count complaint challenged the FOID Act under both the federal and state constitutions. It argued the FOID Act's licensing requirement unconstitutionally burdened the right to keep and bear arms and that its fee provisions constituted an impermissible tax on the free exercise of a constitutional right, in violation of the second and fourteenth amendments to the United States Constitution (U.S. Const., amends. II, XIV) (count I). Raising the same claims, it alleged a violation of Illinois's version of the second amendment in article I, section 22, of the Illinois Constitution (Ill. Const. 1970, art. I, § 22) (count II). GSL further raised equal protection claims under both constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) (counts III and IV).

¶ 6    The same day GSL filed its original complaint, it also filed a motion for a temporary restraining order and a preliminary injunction, seeking to restrain enforcement of the FOID Act. On May 24, 2019, the trial court denied GSL's motion, and GSL filed an interlocutory appeal. In December 2019, this court affirmed the trial court's judgment. *Guns Save Life, Inc. v. Raoul*, 2019 IL App (4th) 190334.

¶ 7    Following the interlocutory appeals process, the trial court granted a motion by defendant Raoul to be dismissed as a party from the case. In November 2020, GSL filed a two-count first amended complaint, asserting the FOID Act is facially unconstitutional under the United States and Illinois Constitutions because it (1) requires a license to own a firearm and (2) imposes an unconstitutional tax on the right to keep and bear arms. Additionally, GSL abandoned its prior equal protection claims and added as defendants McLean County State's Attorney Don Knapp and McLean County Sheriff Jon Sandage. Ultimately, both Knapp and

Sandage were also dismissed as parties from the litigation, and the matter proceeded against only defendant Kelly (hereinafter the State).

¶ 8　　　　　The parties filed cross-motions for summary judgment with the trial court. GSL argued, in part, that the FOID Act could not pass constitutional muster under the text and history framework for evaluating second amendment claims identified by the United States Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). According to GSL, under *Bruen*, the plain text of the second amendment covered the conduct regulated by the FOID Act, but, fatal to the FOID Act's constitutionality, the State could not demonstrate that the FOID Act "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

¶ 9　　　　　The State argued the FOID Act constituted a fee-based, shall-issue licensing regime, which the *Bruen* Court "made clear" was constitutionally permissible. Alternatively, it asserted that the FOID Act is constitutional because it "is consistent with the relevant history and tradition of firearm regulations." In support of its motion, the State presented reports from Professor Saul Cornell, who the State indicated was an expert on the history and tradition of firearm regulation. The State asserted that relevant historical analogues for the FOID Act included disarmament laws "that preemptively disarmed dangerous or 'unvirtuous' people," as well as historical militia laws and surety statutes.

¶ 10　　　　In June 2023, the trial court conducted a hearing on the parties' motions. In July 2023, it entered a written order, granting the State's motion for summary judgment, denying GSL's motion, and entering final judgment in favor of the State. Specifically, the court found the State presented "ample historical evidence supporting the constitutionality of the FOID Act."

¶ 11　　　　This appeal followed.

¶ 12　　　　　　　　　　　　II. ANALYSIS

- 4 -

¶ 13    On appeal, GSL argues the trial court erred by denying its motion for summary judgment, granting the State's cross-motion for summary judgment, and entering a judgment in the State's favor. As it did below, GSL contends the FOID Act is facially unconstitutional under the United States Constitution because it requires a license to own a firearm and imposes fees to obtain a license. GSL asserts that, under *Bruen*, the State has failed to present relevant historical analogues to support the constitutionality of the FOID Act and its fee provisions. (On appeal, GSL does not challenge the FOID Act under the Illinois Constitution.)

¶ 14                                A. Standard of Review

¶ 15    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "When *** the parties file cross-motions for summary judgment, they implicitly agree that there are no genuine issues of material fact and that the dispute involves only questions of law, such that the court may decide the issues based on the record." *Kuhn v. Owners Insurance Co.*, 2024 IL 129895, ¶ 14. The trial court's ruling on a motion for summary judgment is reviewed *de novo*. *Id.*

¶ 16    The constitutionality of a statute also presents a question of law and is subject to *de novo* review. *People v. Villareal*, 2023 IL 127318, ¶ 14. If reasonably possible, a reviewing court must "construe the statute in a way that preserves its constitutionality." *People v. Bochenek*, 2021 IL 125889, ¶ 10. Further, a facial constitutional challenge "is the most difficult challenge to mount successfully, because it requires [the challenging party] to establish that no set of circumstances exists under which the [FOID] Act would be valid." (Internal quotation marks omitted.) *United States v. Rahimi*, 602 U.S. 680, 693 (2024). In the context of a second amendment

challenge, "[t]hat means that to prevail, the Government need only demonstrate that [the challenged firearm regulation] is constitutional in some of its applications." *Id.*

¶ 17                                   B. The Second Amendment

¶ 18        The second amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The second amendment codifies a preexisting right, guaranteeing "the individual right to possess and carry weapons in case of confrontation" (*District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)), and it is applicable to the states through the due process clause of the fourteenth amendment (*McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010)).

¶ 19        In *Bruen*, the United States Supreme Court set forth what it deemed to be the proper analytical framework for determining the constitutionality of firearm regulations under the second amendment. *Bruen*, 597 U.S. at 17. The Court held as follows:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.*

¶ 20        For the government to satisfy the second step of *Bruen*'s text and history framework, it must show that the modern regulation being challenged is " 'relevantly similar' " to

historical firearm regulations. *Id.* at 28-29. The considerations in making that determination include both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, the central considerations are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* Ultimately, however, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." (Emphases in original.) *Id.* at 30. "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

¶ 21        The Supreme Court further explained that, under the text and history analysis, "not all history is created equal." *Id.* at 34. It stated, " 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them,' " noting the second and fourteenth amendments were adopted in 1791 and 1868, respectively. (Emphasis omitted.) *Id.* (quoting *Heller*, 554 U.S. at 634-35). The Court suggested that historical evidence from the founding era was more probative than historical evidence that long predated or postdated that era. *Id.* at 34-37. It noted that, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide *** interpretation of an ambiguous constitutional provision." (Internal quotation marks omitted.) *Id.* at 36.

¶ 22        More recently, in *Rahimi*, the Supreme Court provided additional guidance as to the second step of *Bruen*'s text and history framework. There, the Court emphasized its precedents did not require "a law trapped in amber" and that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691-92. It stated, "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. "A court must ascertain whether the

new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " *Id.* (quoting *Bruen*, 597 U.S. at 29 n.7). "Why and how the regulation burdens the right are central to this inquiry." *Id.* The Court emphasized that "[t]he [challenged] law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.' " *Id.* (quoting *Bruen*, 597 U.S. at 30).

¶ 23                                C. The FOID Act's Licensing Requirement

¶ 24            As noted, GSL argues the FOID Act's licensing requirement is unconstitutional. It contends "the State cannot require its citizens to obtain a license to exercise a fundamental constitutional right" and no founding-era historical analogues exist "that required law-abiding citizens to obtain a license to possess a firearm." GSL characterizes its argument as a challenge to "the State's ability *** to prohibit *everyone* from possessing a firearm until they pay for a license, wait for that license to be issued, carry that license whenever and wherever they possess a firearm, and renew the license every 10 years." (Emphasis in original.) Ultimately, it contends that under *Bruen* the plain text of the second amendment covers the individual conduct at issue—firearm possession—and the State has failed to meet its burden of demonstrating that the FOID Act is consistent with the nation's tradition of firearm regulation.

¶ 25            In response, the State does not dispute that the second amendment covers the individual conduct at issue. Rather, it first argues that a historical analysis is unnecessary in the present case because the FOID Act is a constitutional shall-issue licensing regime under *Bruen*. Alternatively, it contends the FOID Act is constitutional because it is consistent with the nation's history and tradition of firearm regulation. The State points to "three categories of historical evidence": (1) founding-era disarmament laws, including laws aimed at disarming dangerous or

untrustworthy individuals and laws requiring individuals to take loyalty oaths; (2) founding-era militia laws that "establish the historical tradition of States regulating and taxing firearm ownership"; and (3) nineteenth-century laws regulating firearm ownership, including surety laws.

¶ 26 In *Bruen*, 597 U.S. at 12, the Supreme Court considered a second amendment challenge to a New York concealed-carry licensing statute under which applicants had to "prove that 'proper cause exists' " for the issuance of a license. The "proper cause" requirement had been interpreted by courts as requiring a showing of "a special need for self-protection distinguishable from that of the general community." (Internal quotation marks omitted.) *Id.* The Supreme Court characterized the New York statute as a " 'may issue' licensing law[ ], under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id.* at 14-15.

¶ 27 Applying its text and history framework, the Supreme Court held the New York statute was unconstitutional. *Id.* at 39. Initially, the Court found the plain text of the second amendment protected the conduct at issue in the case—the carrying of handguns publicly for self-defense. *Id.* at 32-33. Turning to the question of historical evidence justifying the New York statute and its proper cause requirement, the Court found the historical record did "not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 38.

¶ 28 Notably, the Supreme Court distinguished " 'shall issue' " licensing regimes, "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a

perceived lack of need or suitability." *Id.* at 13. In footnote nine of its decision, the Court provided further guidance regarding shall-issue regimes, explaining as follows:

> "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of *** 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' [Citation.] *Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry.* [Citation.] Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' [Citation.] And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, [citation], rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' [citation]—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." (Emphasis added.) *Id.* at 38 n.9.

¶ 29    In a concurring opinion, Justice Kavanaugh further emphasized that the New York law at issue was an "outlier 'may-issue' licensing regime." *Id.* at 79 (Kavanaugh, J., concurring, joined by Roberts, C.J.). He underscored that the Court's holding did "not prohibit States from imposing licensing requirements for carrying a handgun for self-defense" and that it did not affect

existing shall-issue licensing regimes. *Id.* Justice Kavanaugh explained as follows:

"The Court's decision addresses only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are employed by [six] States including New York. As the Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.' [Citations.] ***

By contrast, 43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. [Citation.] Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. As petitioners acknowledge, shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." *Id.* at 79-80.

¶ 30    As GSL acknowledged at oral argument in this case, the FOID Act constitutes a shall-issue licensing law. A FOID card must be issued upon the satisfaction of objective criteria, including criteria related to an applicant's age, criminal history, and mental health. Significantly,

- 11 -

unlike the may-issue New York statute in *Bruen*, the FOID Act does not grant licensing officials open-ended or unchanneled discretion to deny a firearm license to law-abiding, responsible citizens.

¶ 31 Despite its acknowledgment, GSL disputes the State's contention that *Bruen*'s footnote nine, standing alone, establishes that the FOID Act is constitutional. GSL is correct on this point. Footnote nine explains the limits of the Supreme Court's holding in *Bruen*. It also explicitly references only concealed-carry licensing regimes. The FOID Act is a licensing law that broadly regulates the acquisition and possession of firearms, not a narrower regulation of the public carry of firearms. Accordingly, the State cannot rely on footnote nine to obviate the need for *Bruen*'s text and history analysis in the context of a constitutional challenge to the FOID Act.

¶ 32 Nevertheless, while footnote nine is not necessarily dispositive of the issue on appeal, it does provide important guidance for evaluating the parties' claims regarding the constitutionality of shall-issue licensing regimes like the FOID Act. Here, GSL argues the State cannot require its citizens to obtain a license to exercise a fundamental right and that the FOID Act amounts to an unconstitutional "prior restraint" on the exercise of the right to firearm possession. GSL essentially challenges the FOID Act as an impermissible preemptive restriction that requires an individual to first show he or she is not unqualified to possess a firearm before exercising that right. The dissent's arguments suggest the same view. However, *all* permitting or licensing regimes share such characteristics, and as a result, GSL's and the dissent's argument cannot be reconciled with *Bruen*'s clear suggestion that some licensing regimes are constitutional. See *Maryland Shall Issue, Inc. v. Moore*, 116 F. 4th 211, 235 (4th Cir. 2024) (Rushing, J., concurring, joined by Gregory and Quattlebaum, JJ.) (stating arguments that the second amendment prohibits any advance permission regulatory scheme "is inconsistent with the Supreme Court's reasoning in

- 12 -

Footnote Nine" and finding shall-issue licensing regimes can be consistent with our nation's historical tradition of regulating firearm possession). Further, although *Bruen* involved a firearm licensing regulation, the Supreme Court did not find the challenged statute unconstitutional on that basis. Rather, it relied on a specific aspect of the law that granted discretion to licensing officials regarding whether to issue a license and which, because of that broad discretion, effectively denied some law-abiding citizens their right to public carry for self-defense.

¶ 33 Additionally, to the extent GSL and the dissent characterize the FOID Act as preventing individuals from exercising their second amendment right by broadly prohibiting firearm possession prior to the issuance of a license, their contentions are, again, contradicted by *Bruen*. It is true that *Bruen* explicitly referenced only public carry, shall-issue licensing regimes. However, the FOID Act has the same relevant features of those types of shall-issue licensing laws. It requires that licenses *shall* be issued anytime an applicant satisfies specified objective criteria and does not grant licensing officials discretion to deny a license based upon a perceived lack of need or suitability. In the same way that the shall-issue public carry licensing regimes identified in *Bruen* did "not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry," the FOID Act similarly does not prevent law-abiding, responsible citizens from exercising their second amendment right to acquire and possess firearms. *Bruen*, 597 U.S. at 38 n.9. A brief delay in one's ability to exercise a right does not constitute a denial of that right.

¶ 34 Turning to *Bruen*'s required historical analysis, we note the purpose of the FOID Act is "to promote and protect the health, safety and welfare of the public" by establishing a system through which persons who are prohibited from acquiring and possessing firearms and firearm ammunition can be identified by law enforcement. 430 ILCS 65/1 (West 2022). The objective

criteria used to deny applications for a FOID card are clearly aimed at preventing the possession of firearms by those whose firearm use is likely to pose a danger to the public, *i.e.*, felons, those who otherwise commit crimes of violence, and the mentally ill. *Id.* § 8.

¶ 35 Historical firearm laws that restricted the possession of firearms by dangerous individuals while at the same time allowing firearm possession by law-abiding, responsible citizens are relevantly similar to the FOID Act. In this regard, the State specifically points to founding-era laws that disarmed dangerous or untrustworthy individuals.

¶ 36 On appeal, GSL "does not challenge the State's ability to prohibit felons and the mentally ill from possessing firearms," nor would such a challenge be successful. "[T]he Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Further, the historical record shows "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms." *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024); *United States v. Hunt*, 123 F.4th 697, 706 (4th Cir. 2024) ("To begin, the historical record contains ample support for the categorical disarmament of people who have demonstrated disrespect for legal norms of society." (Internal quotation marks omitted.)); *Atkinson v. Garland*, 70 F.4th 1018, 1035 (7th Cir. 2023) (Wood, J., dissenting) (stating historical evidence "reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed").

¶ 37 Additionally, in *Heller*, 554 U.S. at 626-27, 627 n.26, the Supreme Court explicitly stated that "longstanding prohibitions on the possession of firearms by felons and the mentally ill"

were presumptively lawful. In *McDonald*, 561 U.S. at 786, the Court repeated such "assurances." And in *Rahimi*, to uphold the statute under consideration, the Court relied, in part, on "going armed laws," which "prohibited riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land" and provided for the forfeiture of weapons. (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 697. There, the Court stated the historical regulations it relied upon "confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.

¶ 38 As noted, the FOID Act also includes restrictions for those under the age of 21. 430 ILCS 65/4, 8 (West 2022). Relying on an analysis of historical evidence, our own supreme court in *People v. Aguilar*, 2013 IL 112116, ¶ 27, held that "laws banning the juvenile possession of firearms have been commonplace for almost 150 years and both reflect and comport with a longstanding practice of prohibiting certain classes of individuals from possessing firearms—those whose possession poses a particular danger to the public." (Internal quotation marks omitted.) In *In re Jordan G.*, 2015 IL 116834, ¶ 25, the court held the term "minor" was historically understood to apply to individuals under the age of 21 and stated that its finding in *Aguilar*, "that age[-]based restrictions on the right to keep and bear arms are historically rooted, applies equally to those persons under 21 years of age." Although *Aguilar* and *Jordan G.* predate *Bruen*'s explicit text and history framework, the supreme court's reasoning, which was based on historical evidence, remains relevant. See *People v. Doehring*, 2024 IL App (1st) 230384, ¶ 31 (finding the supreme court's historical tradition analysis in *Aguilar* and *Jordan G.* was equally relevant to the post-*Bruen* text and history framework); see also *People v. Thompson*, 2024 IL App (1st) 221031, ¶ 36 ("The requirement of parental consent for a FOID card for 18- to 20-year-olds is consistent with our historic tradition of parental control over their minor children.").

¶ 39    The State in this case further relies on surety laws as a relevantly similar historical analogue to the FOID Act. Surety laws were preventative in nature. *Rahimi*, 602 U.S. at 695 (describing surety laws as "[a] form of preventive justice" that was "derived from the ancient practice of frankpledges," under which men "mutually pledge[d] for each other's good behaviour" (internal quotation marks omitted)). They provided a mechanism for identifying individuals who posed a threat to public safety and required them to post a bond before carrying a firearm. *Id.* at 696-97. Surety laws relating to firearms presumed the existence of second amendment rights and targeted those individuals likely to misuse firearms. *Id.* at 700. The FOID Act has similar aims and operates in a similar fashion. Like surety laws, the FOID Act has preventative features. It also honors an individual's second amendment right to acquire and possess firearms, while attempting to keep them out of the hands of dangerous individuals who might misuse them. It provides a mechanism for identifying unqualified individuals and restricts the acquisition and possession of firearms by dangerous or unfit individuals through objective criteria.

¶ 40    GSL and the dissent rely on *Bruen*'s discussion of surety laws in arguing they do not present a relevantly similar analogue to the FOID Act. However, *Bruen*'s rejection of surety laws as a proper historical analogue for the New York statute before it was based on the Supreme Court's finding that the New York law "presume[d] that individuals have no public carry right without a showing of heightened need," while "the surety statutes presumed that individuals had a right to public carry." (Emphases omitted.) *Bruen*, 597 U.S. at 56. Unlike the New York law in *Bruen*, the FOID Act does not require a showing of heightened need. As discussed, it is a shall-issue licensing statute that is distinguishable from the New York may-issue licensing law in *Bruen*. Critically, the FOID Act presumes that individuals have a right to the acquisition and possession of firearms through its shall-issue requirements. Further, while *Bruen* dismissed surety laws as a

- 16 -

relevantly similar historical analogue, surety laws were one of the "two distinct legal regimes" relied upon in *Rahimi* to uphold the challenged statute in that case. *Rahimi*, 602 U.S. at 694-95.

¶ 41 Although the historical regulations referred to above are not identical to modern licensing laws like the FOID Act, they do not have to be for the FOID Act to pass constitutional muster. See *id.* at 698 (stating that although the challenged statute was "by no means identical to *** founding era regimes," it did "not need to be"). Contrary to GSL's assertions on appeal, the State was not required to point to a founding-era firearm *licensing* scheme to justify the FOID Act. Here, the FOID Act seeks to identify those individuals unqualified to possess firearms, *i.e.*, felons, the mentally ill, and minors, while recognizing the rights of law-abiding, responsible individuals to firearm possession. Such features are "consistent with the principles that underpin our regulatory tradition" (*id.* at 692), and GSL's facial constitutional challenge to the FOID Act's licensing requirement lacks merit.

¶ 42 D. The Constitutionality of the FOID Act's Fees

¶ 43 On appeal, GSL alternatively argues that the FOID Act's $10 fee is independently unconstitutional. Again, *Bruen* provides guidance on this issue, suggesting shall-issue licensing regimes are subject to constitutional challenges if they have "exorbitant fees" that deny ordinary citizens their second amendment rights. *Bruen*, 597 U.S. at 38 n.9. Here, the FOID Act requires the payment of a $10 fee to obtain a FOID card (430 ILCS 65/5 (West 2022)), and FOID cards remain valid for at least 10 years (*id.* § 7). As the trial court found below, "[a]n application fee that amounts to $1 a year *** is not exorbitant under any definition of the word." The FOID Act's fee provision is constitutional under *Bruen*, and again, GSL's constitutional challenge lacks merit.

¶ 44 III. CONCLUSION

¶ 45 For the reasons stated, we affirm the trial court's judgment.

¶ 46          Affirmed.

¶ 47          JUSTICE CAVANAGH, specially concurring:

¶ 48          For three reasons, I agree that the circuit court's judgment should be affirmed. First, plaintiff admits in its brief, or at least explicitly declines to contest, that felons and the mentally ill—two categories of persons regulated by the FOID Act—are outside the protection of the second amendment. Plaintiff thereby undercuts its claim that the FOID Act is facially unconstitutional, which is to say, violative of the second amendment in all circumstances. Second, because the FOID Act requires the Illinois State Police to issue a FOID card to all applicants who are protected by the second amendment, the FOID Act does not implicate the part of the second amendment's text that forbids an "infringe[ment]" of the right to keep and bear arms. U.S. Const., amend. II. Third, if the FOID Act does implicate the text of the second amendment, colonial loyalty oath statutes are a relevant historical analogue. I will further discuss those three reasons one at a time.

¶ 49          I. PLAINTIFF'S CONCESSION REGARDING FELONS

AND THE MENTALLY ILL

¶ 50          Plaintiff makes a facial challenge to the FOID Act. A facial challenge to a statute is the "most difficult challenge" because the challenger must affirmatively "establish" a negative: "that no set of circumstances exists under which the [statute] would be valid." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 693. According to plaintiff, such circumstances do exist. As plaintiff makes clear in its initial brief, "[p]laintiff does not challenge the State's ability to prohibit felons and the mentally ill from possessing firearms in the State." In fact, plaintiff admits outright that "prohibitions on felons and the mentally ill possessing firearms" do "not burden the right of individuals plainly entitled to exercise Second Amendment rights."

¶ 51          The implication of that admission is that although, as plaintiff rightly observes, the

text of the second amendment covers the conduct of acquiring and possessing firearms and firearm ammunition, denying firearms and firearm ammunition to felons and the mentally ill, as the FOID Act does, "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Disputing that interpretation of the historical tradition would be inconsistent with plaintiff's concession—which plaintiff may not contradict. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 52 Judging by plaintiff's brief, then, there are circumstances in which, consistently with the second amendment as interpreted by *Bruen*, the State may forbid the possession of a firearm by someone who lacks a FOID card, namely, circumstances in which the would-be possessor of a firearm is a felon or is mentally ill. If, as plaintiff concedes, felons and the mentally ill can be constitutionally restricted from possessing firearms—or, at least, if plaintiff explicitly declines to dispute that proposition—plaintiff's facial challenge to the FOID Act fails on the face of plaintiff's brief. Contrary to plaintiff's theory of facial unconstitutionality, there are circumstances in which—as plaintiff admits—the government may constitutionally prohibit those who lack a FOID card from possessing a firearm: circumstances in which the would-be possessor of a firearm is a felon or is mentally ill.

¶ 53 To try to alleviate this discrepancy, plaintiff and the dissent invoke *People v. Burns*, 2015 IL 117387. A careful reading of *Burns* reveals, however, that the case is distinguishable. In *Burns*, the defendant claimed that the statutory section defining aggravated unlawful use of a weapon, section 24-1.6(a)(1) and (a)(3)(A) of the Criminal Code of 1961 (Code) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2008)), was facially unconstitutional under the second amendment. *Burns*, 2015 IL 117387, ¶ 19. Under that statute, a person committed aggravated unlawful use of

a weapon by "knowingly"

"(1) Carr[ying] on or about his or her person or in any vehicle or concealed on or about his or her person \*\*\*[,] or

(2) Carr[ying] or possess[ing] on or about his or her person, upon any public street, alley, or other public lands within the corporate limits of a city, village or incorporated town \*\*\*; and

(3) One of the following factors is present:

(A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense; \*\*\*

\*\*\*

(C) the person possessing the firearm has not been issued a currently valid [FOID] Card[.]" 720 ILCS 5/24-1.6(a) (West 2008).

In the concluding subsection of section 24-1.6, the punishment for this offense was ratcheted up if the offender had a previous felony conviction:

"(d) Sentence. Aggravated unlawful use of a weapon is a Class 4 felony; a second or subsequent offense is a Class 2 felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years. Aggravated unlawful use of a weapon by a person who has been previously convicted of a felony in this State or another jurisdiction is a Class 2 felony for which the person shall be sentenced to a term of imprisonment of not less than 3 years and not more than 7 years." *Id.* § 24-1.6(d).

¶ 54        The State argued in *Burns* that the statutory definition of aggravated unlawful use of a weapon was "not *facially* unconstitutional," given that the statute "[could] be applied to felons

- 20 -

without violating the second amendment." (Emphasis in original.) *Burns*, 2015 IL 117387, ¶ 26. In making that argument, the State "relie[d] on the long-accepted principle that a statute [was] facially unconstitutional only if no set of circumstances exist[ed] under which the [statute] would be valid." (Internal quotation marks omitted.) *Id.* Such circumstances existed, according to the State: possession of a firearm by someone who had a felony record. See *id.*

¶ 55        The supreme court concluded that this argument by the State was "misplaced." *Id.* A facial challenge, the supreme court explained, had to "establish that a law [was] unconstitutional in all of its applications," and according to the supreme court, the only "applications" that counted for that purpose were those in which the statute "actually authorize[d] or prohibit[ed] conduct." (Internal quotation marks omitted.) *Id.* ¶ 27. The "constitutional inquiry" was supposed to "focus" on "the group for whom the law [was] a restriction, not the group for whom the law [was] irrelevant." (Internal quotation marks omitted.) *Id.* The statutory section that the defendant in *Burns* challenged, section 24-1.6(a)(1) and (a)(3)(A) of the Code, did not "prohibit[ ] felons from possessing guns"—"that [was] not what the legislature proscribe[d]" in that section. *Id.* ¶ 29. That the possessor of the firearm "ha[d] a prior felony conviction" was not "an element of the offense." *Id.* A prior felony conviction was merely a sentencing enhancement in subsection (d), not an element of the offense in subsections (a)(1) and (a)(3)(A). *Id.* ¶ 24. The supreme court continued, "An unconstitutional statute does not 'become constitutional' simply because it is applied to a particular category of persons who could have been regulated, had the legislature seen fit to do so." *Id.* The supreme court was concerned that by holding that section 24-1.6(a) and (a)(3)(A) applied only to felons, despite the broader terms in that section, the supreme court would have "rewrit[ten]" that section, "substitut[ing] the judicial for the legislative department of the government." (Internal quotation marks omitted.) *Id.* ¶ 30. The supreme court said in *Burns* that it

was unwilling to thereby violate the separation of powers. See *id.*

¶ 56     I can envision a superficially appealing argument based on *Burns*, as an attempt to shore up plaintiff's facial challenge to the FOID Act. The argument might focus on section 2 of the FOID Act (430 ILCS 65/2 (West 2022)) and might proceed as follows. Section 2, subject to listed exceptions, prohibits *anyone* from possessing a firearm in Illinois without having in his or her possession a FOID card. *Id.* This section of the FOID Act, section 2, contains no mention of felons or persons with a mental illness. See *id.* To be sure, in section 14, possessing a firearm without a FOID card is elevated to a Class 3 felony if "the person is not otherwise eligible under [the FOID] Act" (*id.* § 14(c)(3)): for example, if the person is ineligible because of a felony conviction (see *id.* § 8(c)) or because of mental illness (*id.* § 8(e), (f)). Even so, having a felony conviction or being mentally ill is not an element of section 2 (see *id.* § 2) but is, instead, a sentencing enhancement (see *id.* § 14(c)(3))—just as, in *Burns*, "[a]ggravated unlawful use of a weapon by a person who ha[d] been previously convicted of a felony" (720 ILCS 5/24-1.6(d) (West 2008)) was a sentencing enhancement instead of an element of the offense (see *Burns*, 2015 IL 117387, ¶ 24). To violate section 2 of the FOID Act, the possessor of a firearm need not have a felony conviction or a mental illness. Rather, subsection (a)(1) of section 2 (430 ILCS 65/2(a)(1) (West 2022)) proscribes *anyone's* possession, in Illinois, of a firearm without a FOID card, subject to the exceptions in subsection (b) (*id.* § 2(b)). By holding that subsection (a)(1) constitutionally applied only to felons and the mentally ill, we would effectively rewrite that subsection and violate the separation of powers—or so it might be argued in the manner of *Burns*.

¶ 57     That argument would be unconvincing, however, because section 2 of the FOID Act is not as freestanding as section 24.1-6 of the Code (720 ILCS 5/24-1.6 (West 2008)). Section 24-1.6 (the statute at issue in *Burns*) was simply one item in a long list of offenses collected in the

Code. Section 2, by contrast, is an integral part of an *act*—section 2 is inextricably woven into the FOID Act. The statute in question here, the FOID Act, is not simply the definition of an offense, composed of elements. Plaintiff's constitutional challenge is not to section 2 specifically, but to the FOID Act as a whole. Because of that important difference, the point the supreme court made in *Burns*—*i.e.*, being a felon is not an element of the offense—is not easily transplantable to this case. The present case is significantly different from *Burns*, in which the defendant challenged only a single statutory section that defined an offense. The more capacious subject of plaintiff's facial challenge, the FOID Act, includes provisions that make much of the language in *Burns* inapt.

¶ 58          Consider, for example, section 8 (430 ILCS 65/8 (West 2022)). That section forbids the Illinois State Police to deny an application for a FOID card unless the applicant has certain disqualifications, including (to name a couple of these disqualifications) a felony conviction or a mental illness:

> "The Illinois State Police has authority to deny an application for or to revoke and seize a [FOID] Card previously issued under this Act only if the Illinois State Police finds that the applicant or the person to whom such card was issued is or was at the time of issuance:
>
> * * *
>
> (c) A person convicted of a felony under the laws of this or any other jurisdiction;
>
> ***
>
> (e) A person who has been a patient of a mental health facility within the past 5 years or a person who has been a patient in a mental health facility more than 5 years ago who has not received the certification required under

subsection (u) of this Section [(*id.* § 8(u))]. ***

(f) A person whose mental condition is of such a nature that it poses a clear and present danger to the applicant, any other person or persons, or the community[.]" *Id.* § 8(c), (e), (f).

¶ 59    Therefore, by considering the application of the FOID Act to felons and the mentally ill, a court *would* "consider[ ] *** applications of the statute in which it actually *authorizes* or prohibits *conduct*." (Emphases added and internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 27. Subsections (c), (e), and (f) of section 8 of the FOID Act *authorize* the Illinois State Police to *deny* a FOID card to—specifically—felons and the mentally ill. 430 ILCS 65/8(c), (e), (f) (West 2022). Those subsections empower the Illinois State Police to restrict people with a felony record or a disqualifying mental illness from obtaining a FOID card. It could not be reasonably asserted, then, that the FOID Act "is irrelevant" to felons and the mentally ill because these are not "group[s] for whom the law is a restriction." (Internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 27. Manifestly, the FOID Act is a restriction aimed squarely at felons and the mentally ill: they are singled out in section 8 as groups the Illinois State Police may regard as ineligible for a FOID card. The legislature did not wait until section 12 of the FOID Act to mention felons and the mentally ill as an afterthought, as it were, in a sentencing enhancement. Rather, felons and the mentally ill are "particular categor[ies] of persons" that the legislature "[saw] fit to" "regulate[ ]" earlier in the FOID Act, in section 8. *Id.* ¶ 29. The legislature regulated them by regulating the Illinois State Police.

¶ 60    If regulation through the Illinois State Police is not enough, section 10(c) of the FOID Act (430 ILCS 65/10(c) (West 2022)) regulates felons and the mentally ill more directly. That section provides as follows:

"(c) Any person prohibited from possessing a firearm under Sections 24-1.1 or 24-3.1 of the Criminal Code of 2012[(720 ILCS 5/24-1.1, 24-3.1 (West 2022))] or acquiring a [FOID] Card under Section 8 of this Act [(430 ILCS 65/8 (West 2022))] may apply to the [FOID] Card Review Board or petition the circuit court in the county where the petitioner resides, whichever is applicable in accordance with subsection (a) of this Section, requesting relief from such prohibition and the Board or court may grant such relief if it is established by the applicant to the court's or the Board's satisfaction that:

(0.05) when in the circuit court, the State's Attorney has been served with a written copy of the petition at least 30 days before any such hearing in the circuit court and at the hearing the State's Attorney was afforded an opportunity to present evidence and object to the petition;

(1) the applicant has not been convicted of a forcible felony under the laws of this State or any other jurisdiction within 20 years of the applicant's application for a [FOID] Card, or at least 20 years have passed since the end of any period of imprisonment imposed in relation to that conviction;

(2) the circumstances regarding a criminal conviction, where applicable, the applicant's criminal history and his reputation are such that the applicant will not be likely to act in a manner dangerous to public safety;

(3) granting relief would not be contrary to the public interest; and

(4) granting relief would not be contrary to federal law." *Id.*

¶ 61    The two sections of the Criminal Code of 2012 (Criminal Code) that section 10(c)

references are those defining the offenses of unlawful possession of weapons by a felon (720 ILCS 5/24-1.1 (West 2022)) and unlawful possession of firearms by someone who, within the past five years, has been a patient in a mental institution (*id.* § 3.1(a)(4)). The remaining statutory provision that section 10(c) references is section 8 of the FOID Act (430 ILCS 65/8 (West 2022)), the section authorizing the Illinois State Police to deny a FOID card to felons (see *id.* § 8(c)) and to someone who has been a patient in a mental health facility (*id.* § 8(e)) or who has a dangerous mental condition (*id.* § 8(f)). Would-be possessors of firearms who are under those statutory prohibitions may petition the FOID Card Review Board or the circuit court for "relief from such prohibition." *Id.* § 10(c). Thus, *Burns* is inapposite for the following reason. The FOID Act specifically regulates the conduct of felons and the mentally ill, not only by allowing the Illinois State Police to prohibit them, in particular, from acquiring a FOID card and, hence, from acquiring firearms and firearm ammunition (see *id.* § 8(c), (e), (f)), but also by requiring them to petition the FOID Card Review Board or the circuit court for a removal of the prohibition (see *id.* § 10(c)).

¶ 62        So, there would be no occasion for "rewrit[ing]" the FOID Act to insert regulatory provisions directed specifically at felons and the mentally ill. (Internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 30. In the FOID Act, the legislature has already done that writing— abundantly. See 430 ILCS 65/4(a)(2)(ii), (xv), (xvi), 8(c), (e), (f), 10(c) (West 2022). Misapplying *Burns* to the present case would ignore that legislative writing.

¶ 63        Plaintiff and the dissent point out that the ban on the possession of firearms by felons and the mentally ill is already written into other statutes. See 18 U.S.C. § 922(g)(1), (4) (2018); 720 ILCS 5/24-1.1(a), 24-3.1(a)(4) (West 2022). Therefore, plaintiff reasons, *à la Burns*, that "the FOID Act is effectively only a 'restriction' for the ordinary, law-abiding populace of Illinois and is 'irrelevant' for those who already cannot possess firearms under federal or state

law." The dissent echoes that reasoning.

¶ 64 It is untrue, though, that sections 24-1.1(a) and 24-3.1(a)(4) of the Criminal Code make the FOID Act irrelevant and not a restriction to felons and the mentally ill. Instead, those sections and the FOID Act are dovetailed together and work in tandem. It is precisely because a gun-toting felon lacks a FOID card that he or she is criminally liable for unlawful possession of weapons by a felon. As the statute defining that offense provides, "This Section shall not apply if the person has been granted relief by the Director of the Illinois State Police under Section 10 of the [FOID] Act." 720 ILCS 5/24-1.1(a) (West 2022). If a felon or a mentally ill person has a FOID card, he or she cannot be found guilty of *unlawful* possession of weapons by a felon (see *id.* § 24-1.1) or *unlawful* possession of firearms (see *id.* § 24-3.1), for his or her possession of the firearm is *lawful*. See 430 ILCS 65/10(c) (West 2022).

¶ 65 So, contrary to the position taken by plaintiff and the dissent, the other statutes regulating felons and the mentally ill do not make the FOID Act an irrelevant nonrestriction to felons and the mentally ill. But does the second amendment do so? The dissent seems to think so on the authority of *City of Los Angeles v. Patel*, 576 U.S. 409 (2015). Could *Patel* reasonably serve as authority for the view that the second amendment makes the FOID Act an irrelevant nonrestriction to felons and the mentally ill? *Patel* cannot be pressed into such service.

¶ 66 In *Patel*, on which our supreme court relied in *Burns* (see *Burns*, 2015 IL 117387, ¶ 27), a group of motel operators and a lodging association challenged the facial constitutionality of a single provision of the Los Angeles Municipal Code, a section providing that "hotel guest records 'shall be made available to any officer of the Los Angeles Police Department for inspection.' " *Patel*, 576 U.S. at 413 (quoting Los Angeles Municipal Code § 41.49(3)(a) (amended Mar. 8, 2008)). The challengers maintained that such warrantless inspections were

- 27 -

unreasonable searches within the meaning of the fourth amendment (U.S. Const., amend. IV) and that the provision in question, section 41.49(3)(a), was therefore invalid on its face. See *Patel*, 576 U.S. at 413. The city, on the other hand, argued that this facial challenge had to fail "because such searches [would] never be unconstitutional in all applications." *Id.* at 417. Specifically, the city "point[ed] to situations where police [were] responding to an emergency, where the subject of the search consent[ed] to the intrusion, and where police [were] acting under a court-ordered warrant." *Id.* at 417-18.

¶ 67 The Supreme Court was unconvinced by the city's argument in *Patel* because, in the three circumstances the city listed, section 41.49(3)(a) would not even be applied. See *id.* at 418. The Supreme Court explained, "If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented." *Id.* at 418-19. In other words, fourth amendment case law already held that the police could perform a search, such as a search of hotel guest records, if (1) exigent circumstances created a compelling need for the police to perform the search before there was time to obtain a warrant, (2) the owner consented to a search, or (3) the police had a search warrant. Whenever (1), (2), or (3) applied to a hotel's guest records, police officers did not need section 41.49(3)(a) to tell them they could search the records. The fourth amendment, as interpreted by case law, already said so. In any of those three circumstances, section 41.49(3)(a) would be superfluous and would do no work.

¶ 68 *Patel* would be on point only if the FOID Act were analogous to section 41.49(3)(a) of the Los Angeles Municipal Code. To be analogous to section 41.49(3)(a), the FOID Act would have to be made up of a single proposition: the government may prohibit felons and the mentally

ill from possessing guns—the way that section 41.49(3)(a) was made up of a single proposition: the police may search hotel guest records. Los Angeles Municipal Code § 41.49(3)(a) (amended Mar. 8, 2008). If the FOID Act were made up of that single proposition and nothing more, I could see an argument for the applicability of *Patel* because, as the dissent observes, case law holds that "the second amendment does not encompass felons." *People v. Burns*, 2024 IL App (4th) 230428, ¶ 20. A plausible argument could be made that, in that hypothetical, abbreviated version (which is quite different from its actual version), the FOID Act would do no work but would merely duplicate second amendment case law.

¶ 69    But the FOID Act goes further than recognizing (implicitly) that felons and the mentally ill lack a second amendment right. The FOID Act takes action on the basis of that recognition by providing that felons and the mentally ill who lack a FOID card may not acquire or possess firearms or firearm ammunition. See 430 ILCS 65/2(a)(1), (2) (West 2022). (I am using "mentally ill" as shorthand to include those who, though not necessarily mentally ill at the present, have a history of inpatient psychological treatment as described in section 8.) Although the second amendment has been interpreted as *not forbidding* the government to prohibit felons and the mentally ill from possessing guns (see *Burns*, 2024 IL App (4th) 230428, ¶ 20), I am unaware that the second amendment has ever been interpreted as *requiring* the government to impose such a prohibition. Legislation would be necessary to create such a prohibition—and that legislation is the FOID Act, in conjunction with sections 24-1.1(a) and 24-3.1(a)(4) of the Criminal Code.

¶ 70    Also, the FOID Act creates an administrative and legal apparatus for enforcing the prohibition. As the legislative declaration in the FOID Act puts it:

> "It is hereby declared as a matter of legislative determination that in order to promote and protect the health, safety and welfare of the public, it is necessary and

in the public interest to provide a system of identifying persons who are not qualified to acquire or possess firearms, firearm ammunition, stun guns, and tasers within the State of Illinois by the establishment of a system of [FOID] Cards, thereby establishing a practical and workable system by which law enforcement authorities will be afforded an opportunity to identify those persons who are prohibited by Section 24-3.1 of the Criminal Code *** [(720 ILCS 5/24-3.1 (West 2022))], from acquiring or possessing firearms and firearm ammunition and who are prohibited by this Act from acquiring stun guns and tasers." 430 ILCS 65/1 (West 2022).

This "practical and workable system" of identifying unqualified persons, such as felons and the mentally ill, is not in the second amendment or in case law interpreting the second amendment. FOID cards and the FOID Card Review Board are not in the second amendment. Because the FOID Act *performs work* by regulating gun possession by felons and the mentally ill, the FOID Act cannot reasonably be characterized as a superfluous repetition of second amendment case law (the way that section 41.49(3)(a), in *Patel*, was a superfluous repetition of fourth amendment case law in the circumstances the city cited). Therefore, *Patel* is distinguishable.

¶ 71 Another case cited in *Burns*, 2015 IL 117387, ¶ 27, was *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), the relevance of which to the present case is even harder to make out. In *Planned Parenthood*, a Pennsylvania statute required a woman seeking an abortion to sign a statement that she had notified her husband of her intention to get an abortion. *Id.* at 844. The plaintiffs challenged the statute as facially unconstitutional under the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) as interpreted by *Roe v. Wade*, 410 U.S. 113 (1973). *Planned Parenthood*, 505 U.S. at 845. The defenders of the statute

argued that because most married women who intended to get an abortion notified their husbands anyway, "of their own volition," the statute was not facially unconstitutional. *Id.* at 894. The Supreme Court held that a facial challenge to a statute could not be defeated by identifying people to whom the statute was irrelevant and not a restriction in that those people would voluntarily do what the statute required anyway. *Id.* The Supreme Court noted, for example, that if a statute required newspapers to print a candidate's reply to an editorial that criticized the candidate, the fact that most newspapers already had a policy of printing such a reply would not save the statute from facial unconstitutionality. *Id.* If a statute were facially constitutional simply because some people did not mind doing what the statute required, no statute could ever be held to be facially unconstitutional, for there would always be someone, somewhere, who did not mind.

¶ 72        The rationale in *Planned Parenthood* has nothing to do with the present case. I have never heard the State argue in this case, "Plaintiff's facial challenge to the FOID Act should fail because some people do not mind applying for a FOID card and would apply for one even if they did not have to." That argument is not before us. "A judicial opinion is a response to the issues before the court *** [and] must be read in the light of the issues that were before the court for determination." *Nix v. Smith*, 32 Ill. 2d 465, 470 (1965). By saying, in *Planned Parenthood*, that "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects" and that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant," the Supreme Court responded to a particular issue: whether people who obeyed a statute "of their own volition" saved the statute from facial invalidity. *Planned Parenthood*, 505 U.S. at 894. Applying that language outside the context of the issue it addressed would be a distortion of its meaning. When the language of a case is lifted out of its context, the case can be made to say almost anything.

¶ 73　　　　In sum, plaintiff concedes that felons and the mentally ill—two groups specifically regulated in the FOID Act—have no second amendment right. Given that concession, there are circumstances in which the application of the FOID Act would be "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The FOID Act is "constitutional in some of its applications": when it is applied to felons and the mentally ill. *Rahimi*, 602 U.S. at 693. Therefore, plaintiff cannot maintain, with self-consistency, that the FOID Act is *facially* unconstitutional under the second amendment, or invalid "in all of its applications." (Internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 27.

¶ 74　　　　　　　　　　II. THE LACK OF AN INFRINGEMENT

¶ 75　　　　In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text cover[ed] an individual's conduct, the Constitution presumptively protect[ed] that conduct." *Bruen*, 597 U.S. at 17. Plaintiff's conduct is the acquisition and possession of firearms and firearm ammunition. It is a truism that the phrase in the second amendment "the right of the people to keep and bear Arms" covers the conduct of acquiring and possessing firearms and firearm ammunition. U.S. Const., amend. II.

¶ 76　　　　It cannot be true, though, that just because plaintiff's conduct is covered by that phrase, we necessarily should proceed to the second step of *Bruen*, the step at which the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. If the mere fact that the modern regulation takes arms as its subject matter were enough to necessitate a historical justification pursuant to the second step of *Bruen*, even a regulation that is innocuous to the right to keep and bear arms—such as a regulation requiring a citizen to report to the government his or her purchase of an antiaircraft weapon or a regulation providing that citizens may have unlimited quantities of firearms—would

require, absurdly, a historical justification to avoid offending the second amendment.

¶ 77 The cause of the absurdity would be the disregard of the element of "infringe[ment]," which is just as much a part of the text of the second amendment as "the right of the people to keep and bear Arms." U.S. Const., amend. II. The Supreme Court explained in *Bruen*, "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. The initial, textual assessment of the second amendment must include the textual term "infringe[ment]," not merely the subject matter of "Arms." U.S. Const., amend. II. That the plain text of the second amendment covers an individual's conduct of acquiring and possessing arms is irrelevant unless the regulation somehow thwarts that conduct. To necessitate a search for historical analogues, the regulation must "*target*[ ] conduct at the core of the Second Amendment." (Emphasis added.) *Rahimi*, 602 U.S. at 751 (Thomas, J., dissenting). The need to address the question of infringement, at the first step of *Bruen*, is implied in *Bruen*'s holding that, at the second step, the government must establish that the "modern and historical regulations impose a comparable burden on the right of armed self-defense" and that the "burden is comparably justified." *Bruen*, 597 U.S. at 29. That holding logically presupposes that, at the first step, a burden on the right of armed self-defense, an apparent "infringe[ment]," was found. U.S. Const., amend. II.

¶ 78 By speaking, in this context, of a burden, I do not mean to resurrect the ends-means test, whereby (to quote the dissent) "courts compared the strength of the government regulation's justification against the severity of the burden it placed on the second amendment right of self-defense." *Infra* ¶ 152. Rather, I merely observe that, in an assessment of whether a firearm regulation is inconsistent with the text of the second amendment, the textual term "infringe[ment]"

carries the connotation of a breach, a right-destroying burden. Even the dissent admits that "[a] regulation's constitutionality does not become an issue until a[ ] *** constitutional right is found to be restricted." *Infra* ¶ 139. It seems to me that "restricted" is just another way of saying "burdened."

¶ 79 Comparing the challenged gun regulation to the text of the second amendment, we begin by determining whether the regulation could be plausibly regarded as "infring[ing]" the right of armed self-defense. U.S. Const., amend. II. This comparison of the regulation to the text of the second amendment is only a start, just as the comparison of a regulation to the text of the first amendment (U.S. Const., amend. I) is only a start. In *Bruen*, the Supreme Court drew a parallel between the process of interpreting the second amendment and the process of interpreting the first amendment. See *Bruen*, 597 U.S. at 24-25. The absolute language of both amendments could be qualified by historical evidence. As Justice Kavanaugh remarked in his concurring opinion in *Rahimi*, "A recurring and difficult issue for judges *** is how to interpret vague constitutional text. That issue often arises (as here) in the context of determining exceptions to textually guaranteed individual rights." *Rahimi*, 602 U.S. at 717 (Kavanaugh, J., concurring).

¶ 80 For example, a regulation criminalizing a true threat of violence against an individual could be plausibly characterized, from a purely textual point of view, as "abridging the freedom of speech." U.S. Const., amend. I. Nevertheless, " '[t]rue threats' of violence is [a] historically unprotected category of communication." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). At the second step of the analysis, so to speak—in the historical inquiry—the ban on true threats of violence would find its justification. Similarly, from a purely textual point of view, a ban on going armed with unusually dangerous weapons to the terror of the public could be plausibly characterized as an "infringe[ment]" of the right to "keep and bear Arms." U.S. Const., amend. II.

However, "going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land" is historically unprotected conduct. (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 697. As I understand, then, by analogy to the way we interpret the first amendment, the first question (at the first step of *Bruen*) is whether the gun regulation could be plausibly regarded as meeting the textual description of an "infringe[ment]" of the "right of the people to keep and bear Arms" (U.S. Const., amend. II)—never mind, for the time being, the search for a historical analogue (the second step of *Bruen*).

¶ 81 Plaintiff argues that the FOID Act infringes on the right to keep and bear arms by forbidding a person from exercising that right unless the person has a FOID card. See 430 ILCS 65/2(a)(1), (2) (West 2022). That argument is problematic because unless the applicant for a FOID card has a disqualification listed in section 8—for example, the applicant is a felon (see *id.* § 8(c)) or has a dangerous mental condition or history of mental illness (see *id.* § 8(e), (f))—the Illinois State Police lack the authority to deny the application for a FOID card (see *id.* § 8). Plaintiff characterizes a FOID card as a license to possess firearms, as if the legislature regarded the second amendment as a matter of grace. A FOID card, however, is different from a driver's license, which "is issued in recognition of" "[t]he privilege to drive." *People v. Sass*, 144 Ill. App. 3d 163, 170 (1986). A FOID card is an identification card issued in recognition of the preexisting second amendment right, not the privilege, to keep and bear arms.

¶ 82 For an illustration of this distinction, suppose that *A*, an authority figure, tells *B*, "You may do *X* only if I issue you a badge. But you have an absolute right to a badge, and I have no choice but to give you a badge if you ask for one." *A* goes on to explain to *B*, "The only purpose of these badges is to enable us all to visibly distinguish between those who are entitled to do *X* and those who are not entitled to do *X*. Because you are entitled to do *X*, a badge is yours for the

asking." *B* argues that, by forbidding him to do *X* unless he has a badge, *A* infringes his right to do *X*. That argument is weak, I maintain, because, for *B*, receiving a badge is a right. The badge is an admission by *A*, a visible certificate, that *B* is the sort of person who has a right to do *X*.

¶ 83     To plaintiff, this requirement of a "badge" (in the form of a FOID card) is constitutionally unacceptable. Making the exercise of a constitutional right conditional on receiving a document from the government seems to be, in plaintiff's view, an *ipso facto* violation of the right. This view resembles that of someone who complains that the revolving door of a public building infringes on his right to entry because he must grab the bar and push his way in. Plaintiff and the dissent seem to take the position that, unless the exercise of a constitutional right is frictionless and free of any documentary requirement, as in a state of nature, the right is infringed. The hidden premise of plaintiff's argument is that a constitutional right cannot be the subject of a permit or other documentary requirement. One need not look far to begin doubting that premise.

¶ 84     Take voter registration cards, for example. A voter registration card is the government's written acknowledgment of the person's preexisting "fundamental constitutional" "right to vote." *Tully v. Edgar*, 171 Ill. 2d 297, 306 (1996). Exercising that right without a voter registration card is impossible. And yet, no serious person would characterize voter registration cards as unconstitutional attempts to prevent voting.

¶ 85     Likewise, no one within the protection of the second amendment can seriously claim that the FOID Act stands between him and his constitutional right to defend himself with guns any more than someone could seriously claim that the requirements of signing an application for a passport, supporting the application with proof of identity, and incurring the processing fee of $165 stand in the way of his constitutional "right of exit." *Kent v. Dulles*, 357 U.S. 116, 129

(1958).

¶ 86      Another example of a constitutional activity that can be made conditional on the issuance of a governmental document is a parade or procession on a public street or in a park, which commonly requires a permit. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen," and a street or park is "a quintessential forum for the exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Even so, a city may establish a permitting system "to control the use of its public streets for parades or processions." *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941).

¶ 87      If, at the level of textual analysis, without any reference to colonial history, it is not an "abridg[ement of] the freedom of speech" (U.S. Const., amend. I) to allow a parade or procession only if the organizer has a permit, then, at the level of textual analysis, it cannot be an "infringe[ment]" of the right to keep and bear arms (U.S. Const., amend. II) to allow the possession of firearms and firearm ammunition only if the possessor has a shall-issue FOID card. If the requirement of a FOID card were a breach but the requirement of a parade permit were no breach, the second amendment would be an outlier in the Bill of Rights.

¶ 88      The dissent deplores, without any citation of authority, that I "fail to recognize the unique nature of a constitutional challenge under the second amendment." *Infra* ¶ 110. This lack of recognition on my part is owing to my lack of awareness of any Supreme Court precedent characterizing a challenge under the second amendment as unique in nature. In fact, the Supreme Court has emphasized that the second amendment is not unique. In *Bruen*, the Supreme Court took pains to dispel any impression that the second amendment was "subject to an entirely different body of rules than the other Bill of Rights guarantees." (Internal quotation marks omitted.) *Bruen*, 597 U.S. at 70. The right to keep and bear arms is a civil liberty like any other civil liberty, and as

the Supreme Court observed in *Cox*, "[c]ivil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." *Cox*, 312 U.S. at 574. This public order principle applies not only to the civil liberty of holding parades and processions but also to the civil liberty of acquiring and possessing firearms and firearm ammunition. Regardless of whether the discussion is about free speech, as in *Cox*, or about gun rights, as in the present case, ours is a "system of ordered liberty." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 690. Liberty without order is license.

¶ 89        The Illinois General Assembly could legitimately decide that, instead of repairing public order after the damage has already been inflicted by the abuse of firearms, it would be preferable to maintain public order—and thereby prevent the loss of civil liberties to disorder—by endeavoring to keep firearms out of the hands of untrustworthy persons who lack a second amendment right. The legislature explains this purpose in section 1 of the FOID Act (430 ILCS 65/1 (West 2022)), which I quoted earlier. The "persons who are not qualified to acquire or possess firearms," to which section 1 refers (*id.*), are the persons described in section 8 of the FOID Act (*id.* § 8) as well as in section 24-3.1 of the Criminal Code (720 ILCS 5/24-3.1 (West 2022)). They include felons (see *id.* § 8(c)) and people who have been patients in a mental institution within the past five years (see *id.* § 8(e); 720 ILCS 5/24-3.1(a)(4) (West 2022)). I assume that the disqualified groups in section 8 are unprotected by the second amendment, since plaintiff does not contend otherwise. The purpose of the FOID Act, the legislature explains in section 1, is to "establish[ ] a practical and workable system" for "identify[ing]" these disqualified persons. 430 ILCS 65/1 (West 2022).

¶ 90        There is no tradeoff between that legislative purpose and the second amendment.

There is no occasion for ends-means balancing. We do not have to choose between the second amendment and the FOID Act. We may have, in full force, both the FOID Act and the right of armed self-defense, for every Illinois applicant who is protected by the second amendment is absolutely entitled, by the terms of the FOID Act, to a FOID card.

¶ 91        A FOID card identifies its holder as someone protected by the second amendment, just as a voter registration card identifies its holder as someone entitled to vote. By the same token, someone's lack of a FOID card, if the person sought to acquire a gun or carried a gun outside the home, would signify a possible disqualification and lack of a second amendment right—for otherwise, presumably, the person would have obtained the FOID card to which he or she automatically was entitled. Thus, instead of purporting to *create* a right to acquire and possess firearms, a FOID card functions as a *signifier* of a preexisting right to do so: a right preexisting under section 8 of the FOID Act in that the Illinois State Police have no choice but to grant the application for a FOID card if the applicant has none of the disqualifications in that section, and also a right preexisting under the second amendment.

¶ 92        Another way of looking at the FOID Act is that it is a regulation of *the manner* of possessing firearms instead of a ban on the possession of firearms. See *Bruen*, 597 U.S. at 59 ("The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation." (Emphasis added.)). To prove that the FOID Act is a ban on the possession of firearms, plaintiff and the dissent single out a section of the FOID Act, section 2(a)(1), which provides, "No person may acquire or possess any firearm, stun gun, or taser within this State without having in his or her possession a [FOID] Card previously issued in his or her name by the Illinois State Police under the provisions of this Act." 430 ILCS 65/2(a)(1) (West 2022). They say, in effect, "*Voilà*: an absolute ban." The dissent describes the FOID Act as "[a]

total ban of all firearms" and argues that our nation lacks a "relevant history of a complete ban on firearm possession in every form precedent to governmental approval." *Infra* ¶¶ 166, 192. But permission is not permission if it must be granted. In focusing on the prohibitory terms of section 2, the dissent and plaintiff overlook the offsetting significance of section 8 (430 ILCS 65/8 (West 2022)), which makes the issuance of a FOID card mandatory if the applicant is protected by the second amendment. If we read the FOID Act as a whole, section 2 is not as damning as plaintiff and the dissent make it appear in isolation. "[W]hen legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 701. If we interpret the FOID Act holistically and with the intent of upholding its constitutionality if reasonably possible, the FOID Act provides, essentially, "When acquiring or possessing a firearm, also possess a FOID card—which, if you have a second amendment right, is yours for the asking." Regarded in that light, the FOID Act could be more fairly characterized as an undemanding regulation of the manner of acquiring and possessing firearms instead of a breach of the right to acquire and possess them.

¶ 93    How does one obtain a FOID card? It is easy. All a qualified person must do is get his or her picture taken, fill out the application, staple the picture to the application, and send the application to the Illinois State Police, along with a fee of $10 (perhaps to cover the cost of making the FOID card, which seems analogous to a permit fee in the first amendment context (see *Cox*, 312 U.S. at 576-77). The FOID card will arrive in the mail. Applying for a permit for a parade or procession probably takes more time and effort. Characterizing the trivial effort needed to apply for a FOID card as an unconstitutional burden on the right to keep and bear arms is an exaggeration. The text of the second amendment, with its element of infringement, is not implicated.

¶ 94    III. A PRINCIPLE TO BE GLEANED FROM LOYALTY

OATH STATUTES

¶ 95        Because the Illinois State Police must issue FOID cards to Illinois applicants who are protected by the second amendment, I maintain that the FOID Act does not meet the textual description of an "infringe[ment]" of the right to keep and bear arms. U.S. Const., amend. II. Given the Supreme Court's comparison of the second amendment to the first amendment (see *Bruen*, 597 U.S. at 25), it cannot be right that, while a parade permit is constitutional, a FOID card is unconstitutional. If, however, the FOID Act can plausibly be regarded as meeting the textual description of an "infringe[ment]" of "the right of the people to keep and bear Arms" (U.S. Const., amend. II), and if it is necessary, therefore, to go beyond the first part of *Bruen*'s test and to search our nation's historical tradition for a burden at least as heavy as the feather that the FOID Act lays upon the right of armed self-defense, the disarmament of recusants in colonial America will suffice.

¶ 96        During the Revolutionary War, every man in North Carolina, Rhode Island, Pennsylvania, and Virginia had to take a loyalty oath on pain of being disarmed. See 24 State Records of North Carolina 88 (1777) (Walter Clark ed., 1905); 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (1776) (John Russell Bartlett ed., 1862); 9 The Statutes at Large of Pennsylvania From 1682 to 1801 111-13 (1777) (James T. Mitchell & Henry Flanders eds., 1903); 9 The Statutes at Large; Being a Collection of All the Laws of Virginia 282 (William Waller Hening ed., 1821). In 1776, when Pennsylvania enacted this loyalty oath statute, article XIII of Pennsylvania's constitution provided that "the people have a right to bear arms for the defence of themselves and the state." Penn. Const. 1776, art. XIII. Evidently, then, Pennsylvania saw no inconsistency between its loyalty oath statute and its constitutional guarantee.

¶ 97        Signing a FOID application bears some resemblance to signing a loyalty oath. In

both cases, the subscribers make representations about themselves (the colonist in the loyalty oath and the modern Illinoisan in the FOID application) to reassure the government that, armed, they will pose no threat to "the security of a free State." U.S. Const., amend. II. But for the FOID Act, Illinoisans protected by the second amendment and Illinoisans unprotected by the second amendment would be analogous to colonial revolutionaries and loyalists in that, to quote the Pennsylvania statute of 1777, "both those sorts of persons [would] remain at this time mixed and in some measure undistinguished from each other." Mitchell & Flanders, *supra*, at 111. Like the loyalty oath statutes, the FOID Act creates a system of identification, a means of distinguishing those who have a constitutional right to keep and bear arms from those who lack that right.

¶ 98  The dissent suggests "it would be dubious to rely on historical laws that would be found unconstitutional today, such as those prohibiting individuals from possessing firearms based *** on political persuasion." *Infra* ¶ 181. The question, though, is not whether the historical analogue would be found constitutional today. Instead, the question is how did colonial Americans understand the preexisting right to bear arms that was codified in the second amendment? See *Heller*, 554 U.S. at 592. In other words, judging by the historical analogue, what were the contours of that preexisting right as colonial Americans conceived of it? Evidently, colonial Americans would have disagreed that the right to keep and bear arms was so absolute and unassailable that a person retained that right despite his refusal to assure the government he was not the type of person who might use the arms to imperil the freedom and security of his fellow Americans.

¶ 99  Granted, the first amendment (U.S. Const., amend. I), which is made applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV), might not allow the state to disarm a person merely for "advocating violent means to effect political and economic change." (Internal quotation marks omitted.) *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 448

(1974). I do not understand plaintiff, however, as making a first amendment challenge to the FOID Act. Although there is undoubtedly a first amendment interest in maintaining that Great Britain was in the right in the American Revolution, there is no first amendment interest in being a felon or in being mentally ill. The first amendment aside, the FOID Act and the loyalty oath statutes share a "principle[ ]": arms may be prohibited to persons who refuse to represent to the government that they are not among the classes of persons who would pose a physical threat to the security of a free state. *Rahimi*, 602 U.S. at 692.

¶ 100      It might be objected that individuals who are apt to use firearms irresponsibly or illegally are hardly comparable, in their dangerousness, to Great Britain in the eighteenth century. Because of the awesome power of modern firearms, however, the internal threat that such firearms pose in the hands of the unqualified should not be discounted. Civil liberties can be destroyed not only by forces external to the state but also, as the Supreme Court noted in *Cox*, by anarchy internal to the state (*Cox*, 312 U.S. at 574), especially anarchy empowered by modern weaponry. States can fail from within. Haiti is a cautionary example. Groups of individuals who ought not to have guns can become laws unto themselves, undermining the rule of law on which civil liberties depend. Politically inspired violence, violence driven by resentment toward the legal status quo, and violence for personal material gain or power can all blur together, even in the same individual. Marauding gunmen, if they are numerous enough, might not be so different, in their destabilizing effect, from a menacing foreign power. Coming from within or from without, they are similar in that they violate the peace and dignity of a sovereign state. That being said, I grant that the justification for the FOID Act is "by no means identical to" the justification for the loyalty oath statutes—"but it does not need to be." *Rahimi*, 602 U.S. at 698. It is close enough.

¶ 101      After *Rahimi*, the justification for the historical regulation need not be identical to

the justification for the modern regulation. In *Rahimi*, the majority used affray laws, for example, as a historical analogue to a federal statute that "prohibit[ed] an individual subject to a domestic violence restraining order from possessing a firearm if that order include[d] a finding that he [or she] 'represent[ed] a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." *Id.* at 684-85 (quoting 18 U.S.C. § 922(g)(8) (2018)). Justice Thomas, the author of *Bruen*, protested that "affray laws had a dissimilar burden *and* justification." (Emphasis in original.) *Id.* at 767 (Thomas, J., dissenting). In contrast to the blanket prohibition of the modern regulation, "affray laws prohibited only carrying certain weapons ('dangerous and unusual') in a particular manner ('terrifying the good people of the land' without a need for self-defense) and in particular places (in public)." *Id.* at 770. Also, affray laws "captured only conduct affecting the broader public" (*id.* at 769) and "expressly carve[d] out the very conduct" that the modern regulation "was designed to prevent (interpersonal violence in the home)" (*id.* at 771). Even so, affray laws were one of the historical analogues from which the majority gleaned the principle that, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698 (majority opinion). As the majority put it in *Rahimi*, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692.

¶ 102     Searching the historical record for supporting principles, in the manner of *Rahimi*, is a significantly different methodology—a looser, more flexible methodology—than asking, as in *Bruen*, whether the justification and burden of the historical analogue closely match the justification and burden of the modern regulation. The difference between *Rahimi* and *Bruen* is the difference between a hatchet and an X-Acto knife. In *Rahimi*, the majority of the Supreme Court was more tolerant of divergence or approximation than in *Bruen*. Nonetheless, in the present case,

the dissent assumes that, after *Rahimi*, it is *Bruen* as usual. The dissent argues, in the manner of *Bruen*, that "different mechanisms" in the historical disarmament laws and in the FOID Act "impose different burdens." *Infra* ¶ 184.

¶ 103 That argument did not get the plaintiff very far in *Rahimi*. One of the historical analogues on which the Supreme Court relied in that case, surety laws, imposed a different burden than the modern regulation. *Rahimi*, 602 U.S. at 764 (Thomas, J., dissenting). Surety laws "merely provide[d] financial incentives for responsible arms carrying," without forbidding the acquisition and possession of firearms (internal quotation marks omitted) (*id.* at 766), whereas the modern regulation "impose[d] a burden equivalent to a complete ban on carrying *and* possessing firearms" (emphasis in original) (*id.* at 768). Even so, in the view of the majority of the Supreme Court in *Rahimi*, surety laws were a valid historical analogue. See *id.* at 698 (majority opinion).

¶ 104 When characterizing *Rahimi* as a "reinforce[ment]" of *Bruen*, the dissent misses the significant departure from *Bruen* that *Rahimi* (to Justice Thomas's chagrin) represented. In the manner of *Bruen*, the dissent argues that the "how" of the FOID Act is different from that of the historical disarmament laws. Citing section 4(a)(2) of the FOID Act (430 ILCS 65/4(a)(2) (West 2022)), the dissent argues that "the FOID Act treats *everyone* as presumptively unqualified to possess a firearm until they '[s]ubmit evidence' that they are safe and responsible." (Emphasis in original.) *Infra* ¶ 184. Section 4, however, contains no mention of any such presumption, which, instead, is the dissent's gloss on section 4. One could just as readily argue that section 8 (430 ILCS 65/8 (West 2022)) treats *everyone* as *conclusively* qualified to whom the listed grounds for denial or revocation are inapplicable.

¶ 105 In short, if we follow the guidance of *Rahimi* that "[t]he law must comport with the principles underlying the Second Amendment" but that "it need not be a dead ringer or a historical

- 45 -

twin" (internal quotation marks omitted) (*Rahimi*, 602 U.S. at 692), we can glean a relevant principle from the loyalty oath statutes: the government may screen its citizens for entitlement to possess arms by having them sign a statement that they do not fit into a category of individuals whose possession of firearms would threaten the safety of the community. The FOID Act is an implementation of that principle.

¶ 106        JUSTICE DeARMOND, dissenting:

¶ 107        I respectfully dissent from the majority. This appeal considers whether the FOID Act violates the second amendment by infringing on the people's right to keep and bear arms. The circuit court below determined it did not, finding the FOID Act constitutional because it was consistent with our nation's historical tradition of regulating firearms. I disagree and would reverse.

¶ 108        My colleagues in the majority cannot agree on how to go about it, but they elect to find the FOID Act constitutional. The majority author concludes the FOID Act is "consistent with the principles that underpin our regulatory tradition," while also noting footnote nine of *Bruen* cannot "obviate the need for *Bruen*'s text and history analysis in the context of a constitutional challenge to the FOID Act." (Internal quotation marks omitted.) *Supra* ¶¶ 31, 41. Meanwhile, the special concurrence concludes the FOID Act does not violate the text of the second amendment by finding it "does not implicate the part of the second amendment's text that forbids an 'infringe[ment]' of the right to keep and bear arms"—a position most notable by its absence from any textual analysis demanded by *Bruen*—and "if the FOID Act does implicate the text of the second amendment, colonial loyalty oath statutes are a relevant historical analogue." *Supra* ¶ 48. On the contrary, there is no historical tradition or reasonably relevant principle within our tradition of firearm regulation similar to the FOID Act, and we cannot avoid the *Bruen* test.

¶ 109     The special concurrence does its best to avoid addressing the FOID Act's constitutionality under the second amendment entirely. However, this case presents the most direct second amendment challenge to the FOID Act we have seen. Other cases have addressed the FOID Act's application to the possession of a firearm in the home or as an adjunct to a felony weapons offense aggravated by the failure to possess a FOID card or similar situations where the FOID Act violation is only ancillary to the issue. This is a direct challenge to the FOID Act from people who have had to obtain FOID cards, pay the fees, and renew their cards in order to exercise their second amendment rights.

¶ 110     My colleagues fail to recognize the unique nature of a constitutional challenge under the second amendment. In doing so, they ignore the historical framework within which the second amendment was enacted and the clear direction we have been given by the United States Supreme Court when considering a second amendment challenge. The special concurrence denies awareness of "any Supreme Court precedent characterizing a challenge under the second amendment as unique in nature." *Supra* ¶ 88. The inability of the special concurrence to recognize how the landscape surrounding constitutional challenges has dramatically changed post-*Bruen*, even after reading the four foundational cases I discuss below, is not a limitation on the unique nature of second amendment challenges.

¶ 111     My colleagues begin by discussing the purposes, provisions, and perceived benefits of the FOID Act—a starting point in conflict with the directives we have been given for framing an analysis of the government's efforts to restrict the right to keep and bear arms and which fails to recognize the historical primacy given that right. The special concurrence then takes a slightly different approach, attempting to avoid *Bruen* by starting with the nature of a facial challenge— an approach that, I will explain below, is inconsistent with the *Bruen* test. Failing to understand

the inapplicability of historically restricted persons (felons and the mentally ill) from our constitutional inquiry at all, the special concurrence attempts to craft some sort of "concession" by GSL that the FOID Act is constitutional—a concession never made or even argued.

¶ 112    Our analysis must begin by considering the basic right of protection and how it has been preserved since our nation's founding.

¶ 113                    I. THE SECOND AMENDMENT

¶ 114    The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. Of all the rights enshrined in our Bill of Rights, the second amendment occupies a unique position because it protects the other rights essential for life and liberty. William Blackstone, whose works " 'constituted the preeminent authority on English law for the founding generation' " (*Heller*, 554 U.S. at 593-94 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999))), described the right to bear arms as fundamental to a free society. He observed:

> " 'This may be considered as the true palladium of liberty. … The right to self defence is the first law of nature: in most governments it has been the study of rulers to confine the right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.' " *Heller*, 554 U.S. at 606 (quoting 1 William Blackstone, Commentaries *300).

Although the right to keep and bear arms predates our nation's founding, the law delimiting its contours is of more recent genesis. Unlike other rights enumerated in the Bill of Rights, the second amendment has received little attention until this century. See *Rahimi*, 602 U.S. at 736

(Kavanaugh, J., concurring) ("Second Amendment jurisprudence is still in the relatively early innings, unlike the First, Fourth, and Sixth Amendments, for example."). The second amendment occupies a unique status in the Bill of Rights, and the right it codifies significantly impacts the nature of our analysis. The majority opinion's historical analysis is akin to walking into a movie theater halfway through the film—you might get the general idea by the time it is over, but you cannot fully appreciate the finale without the context created by the earlier scenes.

¶ 115        In *Heller*, the Supreme Court held the preexisting right to self-defense, which the second amendment says is "not to be infringed," would be incompatible with any legislation effectively operating as a total ban on the free and reasonable exercise of second amendment rights, regardless of the legislation's good intentions: "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636. The FOID Act does just that. Justice Gorsuch's concurrence in *Rahimi* explained why such a prohibition is unconstitutional: "[T]he Second Amendment 'codified a *pre-existing* right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have when the people adopted' it." (Emphasis in original.) *Rahimi*, 602 U.S. at 709 (Gorsuch, J., concurring) (quoting *Heller*, 554 U.S. at 592, 634-35). He noted, at the time of the second amendment's ratification, the people "understood an arms-bearing citizenry posed some risks" but they also believed "the right protected by the Second Amendment was itself vital to the preservation of life and liberty." *Rahimi*, 602 U.S. at 709.

¶ 116        II. SECOND AMENDMENT JURISPRUDENCE

¶ 117        Less than 20 years ago, in *Heller*, the Supreme Court initiated a sea change in second amendment jurisprudence. For the first time, the Court recognized the second amendment

protected an individual's right to keep and bear arms and to use those arms for traditionally lawful purposes, such as self-defense within the home. *Heller*, 554 U.S. at 628. This represented a major shift from the previously defined right to keep and bear arms only in the service of an organized militia. See *Heller*, 554 U.S. at 620-26. The *Heller* Court recognized the second amendment did not create a new right but simply codified a right long predating our Constitution. *Heller*, 554 U.S. at 672-73 (" 'This is not a right granted by the Constitution. Neither is it in any manner dependent on that instrument for its existence.' " (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1876))). The Court explained, "The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it shall not be infringed." (Internal quotation marks omitted.) *Heller*, 554 U.S. at 592.

¶ 118 Examining historical precedent, the *Heller* majority observed the right to keep and bear arms in an individual capacity, the predecessor to our second amendment, was part of the English Bill of Rights. "It was clearly an individual right, having nothing whatever to do with service in the militia." *Heller*, 554 U.S. at 593. *Heller* explained, "[T]he Second Amendment was not intended to lay down a novel principl[e] but rather codified a right inherited from our English ancestors." (Internal quotation marks omitted.) *Heller*, 554 U.S. at 599. Indeed, *Heller* observed that, by the time of our country's founding, the right to have arms was "one of the fundamental rights of Englishmen" and was "understood to be an individual right protecting against both public and private violence." *Heller*, 554 U.S. at 594 (citing 1 William Blackstone, Commentaries *136, *139-40). The Court concluded, "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595.

¶ 119 Nevertheless, the *Heller* Court acknowledged, just as with other constitutional

rights, second amendment rights were not unlimited. The Court made it clear that

> "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."
>
> *Heller*, 554 U.S. at 626-27.

Importantly, these excluded categories are irrelevant to our analysis. See *Burns*, 2015 IL 117387, ¶ 27 ("The [l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects …. The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." (Internal quotation marks omitted.)). In finding the District of Columbia's total ban on handgun possession in the home unconstitutional, the *Heller* Court emphasized legislation creating, effectively, a total ban on the free and reasonable exercise of second amendment rights was "off the table," regardless of the good intentions motivating such legislation. *Heller*, 554 U.S. at 636.

¶ 120          *McDonald* inched second amendment jurisprudence a bit further, clarifying a line of cases defining the degree to which the fourteenth amendment extended the various Bill of Rights protections to the states. After a historical analysis, *McDonald* found "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. The Supreme Court concluded "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*," meaning it "applies equally to the Federal Government and the States." *McDonald*, 561 U.S. at 791. With that, the Court left the application and interpretation of the second amendment to the states and lower courts.

¶ 121    Twelve years passed before the Supreme Court again meaningfully addressed second amendment jurisprudence, when it considered the constitutionality of New York's public carry licensing regime in *Bruen*. Its decision in *Bruen* addressed both the test applied to second amendment challenges and the scope of the second amendment's protections. See *Bruen*, 597 U.S. at 18-38. First, the *Bruen* Court corrected the two-step test developed by the lower courts after *Heller* and *McDonald*, which combined history and tradition with means-end scrutiny to evaluate second amendment challenges. See *Bruen*, 597 U.S. at 18-19. *Bruen* found this two-step approach by the appellate courts was "one step too many" (*Bruen*, 597 U.S. at 19) because it included the application of a "judge-empowering interest-balancing inquiry," which *Heller* and *McDonald* expressly rejected. (Internal quotation marks omitted.) *Bruen*, 597 U.S. at 22. The Court explained, "*Heller*'s methodology centered on constitutional text and history" and "did not invoke any means-end test such as strict or intermediate scrutiny." *Bruen*, 597 U.S. at 22. Rejecting any form of interest balancing, *Bruen* asserted, "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." (Emphasis in original.) *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). Lest courts fail to understand, *Bruen* repeated the approach for evaluating second amendment challenges going forward:

> "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." (Internal

quotation marks omitted.) *Bruen*, 597 U.S. at 24.

The Court then provided two metrics to be used to determine whether the challenged regulation was consistent with the nation's historical tradition of firearm regulation—"how and why the regulations burden a law-abiding citizen's right to armed self-defense," because "individual self-defense is the *central component* of the Second Amendment right." (Emphasis in original and internal quotation marks omitted.) *Bruen*, 597 U.S. at 29.

¶ 122 Having clarified the metrics by which second amendment challenges are to be measured, *Bruen* turned to the second amendment's scope. It found New York's public carry licensing regime, which required an applicant to demonstrate a special need for self-defense, violated the second amendment because it infringed on the right to bear arms. *Bruen*, 597 U.S. at 71. The Court reached this conclusion by first conducting a textual analysis of the language of the second amendment and finding "[t]he Second Amendment's plain text thus presumptively guarantees petitioners *** a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. As a result, *Bruen* said the burden was on the respondents "to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 34.

¶ 123 The *Bruen* Court cautioned lower courts conducting historical analyses that, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*' " (Emphasis in original.) *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). Historical evidence significantly predating the second amendment's adoption, with no evidence it was either the basis for the amendment or relied upon to formulate its language, is probably not persuasive. See *Bruen*, 597 U.S. at 34-35. The *Bruen* Court considered this to be equally true for postenactment

history, noting, "[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.' " *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614). Instead, the Court said, any reliance by *Heller* on this later history "was 'treated as mere confirmation of what the Court thought had already been established.' " *Bruen*, 597 U.S. at 37 (quoting *Gamble v. United States*, 587 U.S. 678, 702 (2019)).

¶ 124 Despite historical evidence of "well-defined restrictions" on the public carry of firearms, including "the intent for which one could carry arms, the manner of carry, or the *exceptional circumstances under which one could not carry arms*," the *Bruen* Court ultimately found there was no historical evidence demonstrating a tradition of broadly prohibiting the public carry of firearms for self-defense or of limiting public carry only to law-abiding citizens who could demonstrate "a special need for self-defense." (Emphasis added.) *Bruen*, 597 U.S. at 38. Analyzing historical evidence at or around the time of the founders' adoption of the second amendment, the Court found that, "in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry." *Bruen*, 597 U.S. at 50. After expanding its analysis to consider pre-Civil-War-era legislation, the Court concluded, "The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation." (Emphasis in original.) *Bruen*, 597 U.S. at 59. As a result, the Supreme Court held the "proper cause" requirement of New York's statute was unconstitutional because "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense," nor have they "required law-abiding, responsible citizens to demonstrate a special need" to do so. (Internal quotation marks omitted.)

*Bruen*, 597 U.S. at 70.

¶ 125    Most recently, in *Rahimi*, the Supreme Court reaffirmed *Bruen*'s holding and standard, once again making it clear the "text, history, and tradition" test of *Heller* and *McDonald* is the only test to be applied to second amendment challenges. See *Rahimi*, 602 U.S. at 714 (Gorsuch, J., concurring). By way of explanation, Justice Kavanaugh's concurrence elaborated, "[T]he historical approach examines the laws, practices, and understandings from before and after ratification that may help the interpreter discern the meaning of the constitutional text and the principles embodied in that text." *Rahimi*, 602 U.S. at 717 (Kavanaugh, J., concurring).

¶ 126    The *Rahimi* Court considered a very narrow facial challenge to a federal statute, section 922(g) of the United States Code (18 U.S.C. § 922(g) (2018)), which prohibited the possession of a firearm by anyone subject to a domestic violence restraining order. See *Rahimi*, 602 U.S. at 688-89, 693. Under section 922(g), upon a finding the person "represents a credible threat to the physical safety of [an] intimate partner," he or she can be restricted from possessing a firearm during the period in which the order is in effect. (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 688.

¶ 127    The Court began its analysis by reiterating, "We have held that the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.' " *Rahimi*, 602 U.S. at 690 (quoting *McDonald*, 561 U.S. at 778). "Derived from English practice and codified in the Second Amendment, the right secures for Americans a means of self-defense." *Rahimi*, 602 U.S. at 690. While emphasizing the second amendment's direct historical connection to the personal right of self-defense and its extension to the states through the fourteenth amendment, the *Rahimi* Court noted, "As a leading and early proponent of emancipation observed, 'Disarm a community and you rob them of the means of defending life. Take away their weapons

of defense and you take away the inalienable right of defending liberty.' " *Rahimi*, 602 U.S. at 690 (quoting Cong. Globe, 40th Cong., 2d Sess. 1967 (1868)).

¶ 128        To determine the parameters of the right to keep and bear arms for self-defense, *Rahimi* reinforced *Heller*'s "constitutional text and history" approach with *Bruen*'s directive to examine our "historical tradition of firearm regulation." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 691. Only in this way can we determine whether the challenged regulation fits within our tradition of firearm regulation. "[I]f a challenged regulation fits within that tradition, it is lawful under the Second Amendment." *Rahimi*, 602 U.S. at 691. "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to justify its regulation." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 691.

¶ 129        *Rahimi* tells us to ask whether the challenged regulation is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. We must discern whether the challenged regulation is "relevantly similar" to regulations traditionally imposed on the right to keep and bear arms, focusing on "why" (the purpose) and "how" (the function) the regulation burdens second amendment rights. *Rahimi*, 602 U.S. at 692. The Court provided a caveat particularly relevant here: "Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent *beyond* what was done at the founding." (Emphasis added.) *Rahimi*, 602 U.S. at 692. "The law must comport with the principles underlying the Second Amendment" but is not required to be a "historical twin." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 692. As Justice Barrett put it in her concurrence, "A regulation is constitutional only if the government affirmatively proves that it is 'consistent with the Second Amendment's text and historical understanding.' " *Rahimi*, 602 U.S.

at 737 (Barrett, J., concurring) (quoting *Bruen*, 597 U.S. at 26).

¶ 130        In analyzing our historical tradition of firearm regulation, the *Rahimi* Court grouped the relevant historical analogues into two categories. One was surety laws, a form of preventative justice that "authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Rahimi*, 602 U.S. at 695 (majority opinion). Under the surety laws, if suspected individuals "failed to post a bond, [they] would be jailed," but if they "did post a bond and then broke the peace, the bond would be forfeit." *Rahimi*, 602 U.S. at 695. The second category consisted of "going armed" laws, designed to punish those who menaced others with firearms. *Rahimi*, 602 U.S. at 697. These laws prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 697. This conduct was considered disruptive of the "public order" and purportedly led to violence, and violators were punished by having to forfeit their arms and possible imprisonment. *Rahimi*, 602 U.S. at 697.

¶ 131        After conducting its text, history, and tradition analysis, the *Rahimi* Court found that "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Rahimi*, 602 U.S. at 700. The Court held, "Our tradition of firearm regulation"—as found in surety and "going armed" laws—"allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. As a result, the Court concluded section 922(g)(8) was facially constitutional and could be applied to the defendant. *Rahimi*, 602 U.S. at 700. The existence of a credible threat, coupled with the impartial determination of a designated tribunal, adequately protected the preexisting right of armed self-defense for otherwise law-abiding citizens. Parenthetically and of particular relevance here, the Supreme Court noted

approvingly that the restrictions imposed by section 922(g)(8) were temporary and did not broadly restrict arms use by the public generally, unlike the restriction struck down by *Bruen*. *Rahimi*, 602 U.S. at 698-99. Conversely, the FOID Act is a regulation that broadly restricts arms use by the public generally.

¶ 132     The more scrutiny the United States Supreme Court has given to second amendment rights, the more evident it has become there is a clear, long-standing history protecting the basic, nearly unfettered right of law-abiding citizens to acquire and possess firearms. A distinction has always existed between the mere possession of firearms and the more historically regulated public carry of firearms. It is equally evident from the studies of historical tradition found in *Heller*, *McDonald*, *Bruen*, and *Rahimi*, there is no historical tradition of prohibiting all persons from acquiring or possessing firearms first, and then determining whether they fall within the class of persons otherwise entitled to or excluded from exercising that preexisting right codified by the founders in the second amendment. In every instance where a historical analogue is used to justify modern firearm regulation, other than those already historically restricted, it was the preexisting right to possess firearms that was subsequently affected by conduct, status, or circumstances. This is in contrast with the FOID Act, first passed in 1968 and constituting an outlier in our 50 states. It provides: "*No person* may acquire or possess any firearm, stun gun, or taser within this State without having in his or her possession a [FOID] Card previously issued in his or her name by the Illinois State Police under the provisions of this Act." (Emphasis added.) 430 ILCS 65/2(a)(1) (West 2022).

¶ 133                           III. THIS CASE

¶ 134     GSL maintains the second amendment's plain text covers its members' conduct of acquiring and possessing firearms and ammunition. Accordingly, it contends "the [FOID] card

- 58 -

requirement has no grounding in the history and tradition of firearms regulations in this Nation" and so "the FOID Act violates the Second Amendment by requiring a license to own a firearm." The State counters by arguing "the FOID Act is a constitutional shall-issue regime" that has been approved by the United States Supreme Court. Alternatively, the State argues "the FOID Act's requirement that potential firearms owners must first 'submit evidence' that they do not fall within a prohibited class and are issued a FOID card before they can obtain a firearm [(see 430 ILCS 65/2(a)(1), 4(a)(2) (West 2022))] is constitutional because it is consistent with this Nation's history and tradition of regulating firearms."

¶ 135          In doing so, the State points to three categories of laws as being "relevantly similar" analogues to the FOID Act. Specifically, the State directs our attention to (1) disarmament laws, such as those disarming anyone who refused to swear an oath of allegiance, and surety laws, like those discussed above; (2) colonial militia-training laws; and (3) various nineteenth-century laws addressing the registration and taxation requirements of certain firearms. The State contends that, collectively, these laws share a comparable burden to Illinois's FOID card requirement because they establish the founding generation understood that dangerous or untrustworthy people could be disarmed and that states could regulate firearm ownership through certification, registration, and taxation. Further, the State argues these laws, like the FOID Act, share a comparable justification in that they were enacted to promote public safety and keep the peace.

¶ 136                              A. Standard of Review

¶ 137          My colleagues emphasized GSL, by bringing a facial constitutional challenge, subjects its argument to the "most exacting standard" in constitutional law. (Internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 27. A facial challenge "is the most difficult challenge to mount successfully, because it requires a [petitioner] to establish that no set of circumstances

exists under which the [law] would be valid." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 693. To defeat GSL's claim, "*the Government* need only demonstrate that [the FOID Act] is constitutional in some of its applications." (Emphasis added.) *Rahimi*, 602 U.S. at 693. But as stated above, the *State* bears the burden of demonstrating the constitutionality of a governmental regulation affecting conduct covered by the second amendment. *Rahimi*, 602 U.S. at 691.

¶ 138        How and where the process of evaluating a facial challenge comes into play is what both the State and my colleagues get wrong. Even within the context of the facial challenge raised in *Rahimi*, the Court still applied the *Bruen* test first in order to determine whether the government had demonstrated a constitutional application of the statute in question. "As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. They made it clear the burden was on the government. With the advent of the *Bruen* test, as reinforced by *Rahimi*, we know there is a required procedure to follow when analyzing any challenge in the second amendment context. Accordingly, we cannot use the facial challenge standard to skirt a *Bruen* analysis. When a constitutional challenge, either facial or as applied, is brought under the second amendment and the plaintiff establishes the restricted conduct is covered by the second amendment, the burden falls on the State to show the restriction " 'is consistent with the Nation's historical tradition of firearm regulation.' " *Rahimi*, 602 U.S. at 689 (quoting *Bruen*, 597 U.S. at 24). If covered by the second amendment's text, the conduct is presumed to be constitutionally protected, and it becomes the government's burden to prove otherwise. This is because, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.' " *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24). If the conduct does not fall within the amendment's plain text, no

constitutional question exists, and a historical tradition analysis is not necessary. If the conduct is textually protected but subject to a "relevantly similar" historical regulation, the regulation is constitutional because there is an identifiable relevantly similar tradition permitting the regulation, as was the situation in *Rahimi*. See *Rahimi*, 602 U.S. at 700. Even within the context of a facial challenge, both *Bruen* and *Rahimi* found the government bore the burden to show historical analogues or "principles that underpin our regulatory tradition" were consistent with modern gun laws. *Rahimi*, 602 U.S. at 692; see *Bruen*, 597 U.S. at 24-31. If the government succeeds, the constitutional challenge ends there. See, *e.g.*, *Rahimi*, 602 U.S. at 693-702. If it fails, "the question becomes whether that law, in at least some of its applications, is consistent with historic firearm regulations." *Rahimi*, 602 U.S. at 708 (Gorsuch, J., concurring). Regardless, the State has the burden. *Rahimi*, 602 U.S. at 691 (majority opinion). This part of the facial challenge comes into play if the State can point to any constitutional application of the Act. See *Rahimi*, 602 U.S. at 692 (majority opinion), 708-09 (Gorsuch, J., concurring).

¶ 139        Starting our analysis with the facial challenge question puts the cart before the horse. A regulation's constitutionality does not become an issue until an identified (read, textually covered) constitutional right is found to be restricted. There is no constitutional question (*i.e.*, facial challenge) until we reach the second step of the *Bruen* analysis.

¶ 140                    B. Application of a Facial Challenge to Felons,

the Mentally Ill, and Minors

¶ 141        When "assessing whether a statute meets [the exacting standards of a facial challenge], the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct." (Internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 27. "The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the

group for whom the law is irrelevant." (Internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 27. Consequently, judging GSL's facial challenge requires an examination of second amendment precedent to measure the right's breadth in both substance and application.

¶ 142        This is not a principle exclusive to second amendment challenges as referenced in *Burns* and, contrary to the best efforts of the special concurrence, is not *sui generis*. It is true regardless of the nature of the constitutional challenge. In *Planned Parenthood*, 505 U.S. at 894, *overruled by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the Supreme Court applied the same standard, finding, "Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. *** The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." While *Dobbs* overturned *Planned Parenthood*'s holding on the constitutionality of abortion rights, it said nothing contrary to *Planned Parenthood*'s framework for addressing a constitutional inquiry writ large. See *Dobbs*, 597 U.S. at 235-92. The principle remains, and it transcends highly politicized issues like abortion and guns. In *Patel*, while discussing facial constitutional challenges in the context of warrantless searches, the Supreme Court again quoted the same *Planned Parenthood* language, noting, "[W]hen addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *Patel*, 576 U.S. at 418. "Accordingly, the constitutional 'applications' that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute." *Patel*, 576 U.S. at 419. While it is true the facts and statutes considered by these cases are easily distinguished, the overarching legal principle governing the proper focus of a constitutional inquiry remains the same. Using the logic of the special concurrence, every Supreme Court decision is fact-specific,

and the principles espoused therein are not applicable in any other setting. So much for *stare decisis*.

¶ 143    As *Heller* told us, felons and the mentally ill have historically been prevented from possessing a firearm. See *Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."). This prohibition remains under both federal law and other state criminal statutes. See, *e.g.*, 18 U.S.C. § 922(g) (2024); 720 ILCS 5/24-1.1, 24-3.1 (West 2022). Rather than serve as evidence of the FOID Act's constitutionality, this long-standing prohibition shows felons and the mentally ill are unaffected by the FOID Act and are therefore not part of the "constitutional inquiry." See *Patel*, 576 U.S. at 418; *Burns*, 2015 IL 117387, ¶ 27. We have said and held as much recently. It has become a mantra of sorts in this district and others—"the second amendment does not encompass felons," therefore "the *Bruen* decision does not apply to felons." (Internal quotation marks omitted.) *Burns*, 2024 IL App (4th) 230428, ¶ 20 (citing *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶¶ 15-16); see *People v. Gardner*, 2024 IL App (4th) 230443, ¶ 68 (relying on *Burns* and *Boyce*'s rationale to find *Bruen* does not apply to felons because they fall outside of the second amendment's protections); *People v. Dillard*, 2024 IL App (4th) 231090-U, ¶ 27 (same); *People v. Mallery*, 2024 IL App (4th) 231397-U, ¶¶ 21-26 (same); *People v. Pruitte*, 2024 IL App (4th) 240013-U, ¶¶ 34-36 (same); *People v. Johnson*, 2024 IL App (4th) 231251-U, ¶ 51 (same); *People v. Stokich*, 2024 IL App (4th) 240192-U, ¶¶ 39-45 (same); *People v. Gilbert*, 2024 IL App (4th) 231164-U, ¶ 33 (same); *People v. Box*, 2024 IL App (4th) 230649-U, ¶ 81 (same); *People v. Langston*, 2023 IL App (4th) 230162-U, ¶ 19 (same); see also *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 22 (rejecting a felon's facial challenge because "*Bruen* is clear that second amendment rights apply to law-abiding citizens for self-defense"); *People v. Baker*, 2023 IL App (1st) 220328,

¶ 37 (same); *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 28 (same). This court and others have made it clear that, for purposes of a second amendment challenge to the FOID Act, felons are not protected because they are not affected. Therefore, felons cannot serve as examples of the FOID Act's constitutional application if what prevents them from acquiring and possessing firearms is their preexisting status unrelated to the FOID Act. They are already prohibited by state and federal law. Any reliance on previously excluded classes of persons to justify a "historical tradition" supporting the FOID Act fails because the law is irrelevant to their inability to exercise second amendment rights. They are prohibited by a long-standing tradition, which formed the basis for the criminal statutes prohibiting them from possession. The FOID Act is not the cause of their restriction. My colleagues mistakenly rely on these categories to find the FOID Act constitutional.

¶ 144        The same is equally true for minors, as they too have been historically prevented from possessing firearms. The majority proves this point by citing *Aguilar*, 2013 IL 112116, ¶ 27, which declares, "[L]aws banning the juvenile possession of firearms have been commonplace for almost 150 years and both reflect and comport with a longstanding practice of prohibiting certain classes of individuals from possessing firearms—those whose possession poses a particular danger to the public." (Internal quotation marks omitted.) Minors are not part of our constitutional inquiry any more than felons and the mentally ill because our inquiry is limited to "the group for whom the law is a restriction." (Internal quotation marks omitted.) *Burns*, 2015 IL 117387, ¶ 27. The FOID Act is not a restriction on minors because they have been historically prohibited from possessing firearms and they are unaffected by the FOID Act. For them, the law is irrelevant. See *Burns*, 2015 IL 117387, ¶ 27.

¶ 145                    C. Application of the *Bruen* Test in This Case

¶ 146            1. *The Second Amendment Covers GSL's Proposed Conduct*

¶ 147    *Bruen* requires us to consider first whether the second amendment covers GSL's members' proposed conduct—acquiring and possessing firearms and firearm ammunition. Per *Heller*'s analysis and holding, the right to acquire and possess firearms undoubtedly does fall under the second amendment's purview. See *Heller*, 554 U.S. at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."). Acquiring and possessing firearms is inherent to keeping them. See *Heller*, 554 U.S. at 583 (" 'Keep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." (Emphasis in original.)). We next ask whether the challenged governmental regulation restricts the exercise of the constitutionally protected right; if it does, the regulation is *presumed* to be unconstitutional. See *Bruen*, 597 U.S. at 24. The FOID Act employs broad terms, providing, "*No person* may acquire or possess *any firearm*, stun gun, or taser within this State without having *in his or her possession* a [FOID] Card previously issued in his or her name by the Illinois State Police under the provisions of this Act." (Emphases added.) 430 ILCS 65/2(a)(1) (West 2022). The FOID Act's restrictions apply to any person in this state. See *Burns*, 2015 IL 117387, ¶ 27 (finding a constitutional analysis focuses on the people for whom the challenged law acts as a restriction). Accordingly, under *Bruen*, the government must justify the FOID Act by demonstrating its total prohibition on firearm acquisition and possession proves consistent with this nation's historical tradition of firearm regulation. See *Bruen*, 597 U.S. at 17, 26-29.

¶ 148    2. *The Special Concurrence's Approach Departs From* Bruen

¶ 149    The special concurrence attempts to circumvent the textual analysis by confusing the purposes of the prefatory and operative clauses of the second amendment as explained in *Heller*, 554 U.S. at 578-92. In a stunning example of turning constitutional interpretation on its

head, the special concurrence finds at the outset, before any analysis whatsoever, that only *infringed* rights to keep and bear arms are relevant to a second amendment challenge and, since the FOID Act does not textually "infringe" on a person's right to acquire or possess firearms, it is therefore constitutional. The special concurrence first finds the FOID Act is not an infringement, then concludes, because it is not, the conduct is not contained within the text of the second amendment. *Supra* ¶ 93. This interpretation of the constitutional inquiry conducted for second amendment challenges is not found anywhere, and the special concurrence does not direct us to any case supporting its claim that "infringement" is part of the textual analysis of covered conduct. The special concurrence finds the language of the second amendment "the right of the people to keep and bear Arms" "a [mere] truism" and says "[i]t cannot be true, though, that just because plaintiff's conduct is covered by that phrase, we necessarily should proceed to the second step of *Bruen*." *Supra* ¶¶ 75-76. Unfortunately, that is *exactly* what *Bruen* said.

¶ 150        There is no weighing of the burden or infringement at the textual analysis stage. The question is simple: Is the *conduct*, not the *conduct and effect* of the challenged regulation, covered by the text of the second amendment? The special concurrence creates a false argument: "The initial, textual assessment of the second amendment must include the textual term 'infringe[ment],' not merely the subject matter of 'Arms.' " *Supra* ¶ 77. Such an argument conflates the protections offered in the operative phrase "shall not be infringed" and the conduct to be protected, "the right of the people to keep and bear arms." "Arms" is not just the subject matter, as the special concurrence describes it. It is the fundamental, preexisting right codified in our second amendment that the government is prohibited from infringing upon. *Bruen* and *Rahimi* tell us we must find a historical analogue or identifiable relevantly similar tradition forming a basis for the claimed infringement before it can be found constitutional. The special concurrence

- 66 -

presupposes there is a weighing of the burden placed on protected conduct at the first stage of the *Bruen* analysis. There is none. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. The only weighing occurs at the second step, during a reviewing court's search for a relevantly similar historical analogue. See *Bruen*, 597 U.S. at 17 ("To justify its regulation, *the government may not simply posit that the regulation promotes an important interest*," otherwise known as a "means-ends" analysis. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." (Emphasis added.)). Under *Bruen*, once the conduct is found to be protected, the government must point to a historically similar tradition or principle permitting the challenged restriction. *Bruen*, 597 U.S. at 17; *Rahimi*, 602 U.S. at 692. In fact, *Rahimi* cautioned, "Even when a law regulates arms-bearing for a permissible reason *** it may not be compatible with the [second amendment] if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692.

¶ 151     There is no more to the *Bruen* test. It does not include a consideration of how other constitutional rights may be exercised, limited, or restricted. It does not compare the second amendment to other constitutional rights to discern its contours. It does not entail a parsing of the FOID Act to find compatible dictionary definitions. It does not compare the FOID Act to other modern regulations. It does not urge us to weigh the effect and efficacy of the FOID Act's requirements. And it most definitely does not allow for the application of any sort of "means-ends" analysis. See *Bruen*, 597 U.S. at 17.

¶ 152     To justify its claim that we need not proceed past *Bruen*'s first step, the special concurrence effectively says the second part of the *Bruen* test, the historical analysis, presupposes that, in the first part of the test, in the textual analysis, we found a "burden on the right of armed

self-defense." *Bruen*, 597 U.S. at 29; *supra* ¶ 77. Under the reasoning of the special concurrence, if the FOID Act does not burden the right of armed self-defense, there is no occasion for finding a " 'comparable burden' " in the historical record, and by the way, I have concluded it does not, so we are done. *Supra* ¶ 77. This reasoning conflates language from the *Bruen* test's second step with the "how" and "why" metrics used to determine whether the challenged regulation is consistent with the nation's historical tradition of firearm regulation. See *Bruen*, 597 U.S. at 29 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." (Internal quotation marks omitted.)). We conduct an "analogical inquiry" when "the government identif[ies] a well-established and representative historical analogue" to compare to the modern-day regulation being challenged. (Emphasis omitted.) *Bruen*, 597 U.S. at 30. Whether "a historical regulation is a proper analogue for a distinctly modern firearm regulation," and therefore a comparable burden, is part of the second step of the *Bruen* test, not the first. *Bruen*, 597 U.S. at 28-29. The special concurrence's application of "burden" is a carryover from the now rejected application of intermediate scrutiny to second amendment cases, where courts compared the strength of the government regulation's justification against the severity of the burden it placed on the second amendment right of self-defense. See *People v. Chairez*, 2018 IL 121417, ¶ 35. This is the "judge-empowering interest balancing inquiry" *Heller* and *McDonald* abandoned. (Internal quotation marks omitted.) *Bruen*, 597 U.S. at 22. The special concurrence mistakenly adds interest balancing to the first step of *Bruen* to avoid the second step's historical analysis. The special concurrence's claim this case can be decided at the first step must fail.

¶ 153     However, the State argues it need not defend the FOID Act because *Bruen* already determined it passed constitutional muster. The special concurrence ignores this issue entirely,

choosing instead to focus on its conclusion the FOID Act does not "infringe" on the right to keep and bear arms, so our analysis is done. They are both wrong.

¶ 154                               3. *Shall-Issue Regime*

¶ 155          To avoid the history and tradition analysis, the State claims a justification for the FOID Act and the public carry statutes intended to keep guns out of dangerous hands referenced in *Bruen*'s footnote nine. A stark difference exists between the two. Concealed or public carry regulations only come into play when a law-abiding gun owner, who enjoys the right to acquire and possess firearms, elects to seek approval to carry a firearm publicly. By doing so, he voluntarily subjects himself to additional historically recognized regulation beyond mere ownership. Conversely, the FOID Act, without a showing or claim of dangerousness, history of restriction, or any other condition precluding gun ownership, prevents anyone from acquiring or possessing a firearm in their own home—the most basic right of self-defense. See *Heller*, 554 U.S. at 628-29; *McDonald*, 561 U.S. at 767-68. Concealed or public carry regulations do not work to prevent ownership of firearms. The FOID Act does. Such a restriction has no historical tradition and has been an outlier since its inception.

¶ 156          The State maintains "[t]he FOID Act is a constitutional, shall-issue licensing regime under *Bruen*," arguing it "shares the same goal as the shall-issue licensing regimes discussed in *Bruen*—ensuring that those exercising their Second Amendment rights within the jurisdiction 'are, in fact, law abiding, responsible citizens.' " (quoting *Bruen*, 597 U.S. at 38 n.9). The State builds this argument almost entirely upon footnote nine in *Bruen*.

¶ 157          As noted previously, in considering the proper-cause requirement in New York's public carry law, the *Bruen* Court determined our nation did not have "a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense," "[n]or is there any such

historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Bruen*, 597 U.S. at 38. The Court then inserted footnote nine, which reads:

"To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to *public carry*. [*Heller*, 554 U.S. at 635.] Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those *bearing arms* in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid.* And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969), rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens *their right to public carry*." (Emphases added.) *Bruen*, 597 U.S. at 38 n.9.

Based on this, the State seems to believe *Bruen* blessed *all* shall-issue licensing regimes. However, footnote nine's language does not support this position.

¶ 158　　　The 43 shall-issue regimes mentioned in footnote nine are first listed in footnote one. See *Bruen*, 597 U.S. at 13 n.1. Footnote one provides contextual citations for the Court's discussion of the nation's various public carry licensing schemes. The Court contrasted New York's "may issue" law, where applicants had to show a special need for public carry, with laws that had no such requirement, observing, "But the vast majority of States—43 by our count—are 'shall issue' jurisdictions, where authorities must issue *concealed-carry licenses* whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." (Emphasis added.) *Bruen*, 597 U.S. at 13. Footnote one immediately follows this sentence, and all 43 statutes cited therein are public carry laws. Footnote one's list includes section 10 of Illinois's Firearm Concealed Carry Act (430 ILCS 66/10 (West 2022)). If footnote nine deemed any laws presumptively constitutional, it would be these 43 laws only. The FOID Act is not cited in footnote one, or anywhere else in *Bruen*, so we cannot presume the United States Supreme Court has already ruled on its constitutionality.

¶ 159　　　The majority says GSL acknowledged the FOID Act was a "shall issue" licensing regime, but that does not determine the Act's constitutionality. As the circuit court below recognized in its final order, *Bruen* did not apply to every "shall issue" licensing regime where the state must issue a permit, license, or identification card to any applicant that meets certain objective criteria. Instead, it acknowledged the FOID Act was a "shall issue" regime in the broader sense of the term. *Bruen* used the term as a descriptor, not as a legal definition for all such regimes regulating the personal possession or public carry of firearms. *Bruen* explicitly stated it decided only the narrow issue of whether "the Second Amendment protects the right of law-abiding people

- 71 -

*to carry* a gun outside the home for self-defense." (Emphasis added.) *Bruen*, 597 U.S. at 76 (Alito, J., concurring).

¶ 160      The State tries to equate the FOID Act with the Firearm Concealed Carry Act because the two laws contain some of the same requirements, like background checks. See 430 ILCS 65/3 (West 2022); 430 ILCS 66/85 (West 2022). But the two laws also have very different requirements, like whether or not an applicant must complete a gun safety course by a certified instructor and whether they must do so every time the $150 permit is renewed at five-year intervals. See 430 ILCS 65/4, 5 (West 2022); 430 ILCS 66/60(b), 75(b) (West 2022). These additional requirements for concealed-carry permits exist because of the differences between possessing a weapon at home or in public—differences already noted by the courts. See *Berron v. Illinois Concealed Carry Licensing Review Board*, 825 F.3d 843, 847 (7th Cir. 2016) ("[T]he different degrees of danger posed by possessing a weapon at home (the basic license) and carrying a loaded weapon in public (the concealed-carry license) justify different systems.").

¶ 161      At oral argument, the State likened the two laws based on their shared justification of keeping guns out of dangerous hands, arguing that if a person poses a danger in public, then the person also poses a danger in private. Therefore, the State reasoned, *Bruen*'s approval of Illinois's concealed carry law necessarily extended to the FOID Act. For three reasons, I cannot agree. First, the *Berron* court already found public carry and private possession in one's home pose "different degrees of danger" to society. *Berron*, 825 F.3d at 847. Second, *Bruen* expressly addressed a specific subset of firearm regulation, namely public carry laws that have "traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Bruen*, 597 U.S. at 38. None of the public carry regulations listed in *Bruen* relate to the simple possession of

firearms, which, historically, has not been restricted absent a claim or showing of dangerousness on the part of the gun owner. This is because historical tradition *permitted* the regulation of public carry while *presuming* the unregulated individual right to possess firearms in the home. Third, the second step of the *Bruen* test does not involve a comparison of modern firearm regulations—a mistake made by both of my colleagues here.

¶ 162        Not only did the Supreme Court reference just 43 public carry statutes, but the language used by the *Bruen* Court in footnote nine also limits its reach. Footnote nine twice references the second amendment "right to public carry." *Bruen*, 597 U.S. at 38 n.9. It once uses the phrase "bearing arms," which obviously connotes carrying weapons. *Bruen*, 597 U.S. at 38 n.9. Based on the language used and the statutes cited, it is clear footnote nine contemplated shall-issue licensing regimes for public carry, not *all* shall-issue laws.

¶ 163        The concurring opinions emphasized *Bruen*'s narrow holding. Justice Alito wrote: "[T]oday's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this purpose. *That is all we decide*." (Emphasis added.) *Bruen*, 597 U.S. at 71-72 (Alito, J., concurring). He went on to detail what *Bruen* did not decide, like who may possess firearms, who may buy firearms, what type of firearms people may possess, age limits for purchasing or possessing a firearm, or what regulations can be imposed on keeping or bearing arms. *Bruen*, 597 U.S. at 72-73. Justice Alito deemed it necessary to make *Bruen*'s limiting holding even more abundantly clear, saying, "I reiterate: *All that we decide in this case* is that the Second Amendment protects the right of law-abiding people *to carry* a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional." (Emphases added.) *Bruen*, 597 U.S. at 76.

¶ 164    Justice Kavanaugh's concurrence, which Chief Justice Roberts joined, noted *Bruen* "does not prohibit States from imposing licensing requirements for *carrying* a handgun for self-defense." (Emphasis added.) *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring, joined by Roberts, C.J.). Kavanaugh made explicit what footnote nine implied, saying, "[T]he 43 States that employ objective shall-issue licensing regimes for *carrying* handguns for self-defense may continue to do so." (Emphasis added.) *Bruen*, 597 U.S. at 80. Like the majority and Justice Alito, Justice Kavanaugh was careful to couch both the issue and his concurrence as relating only to public carry.

¶ 165    It is a *non sequitur* to presume the *Bruen* Court, which relied solely on text and history to discern the contours of the second amendment right to public carry, approved a noncarry licensing scheme neither considered nor referenced in the opinion, especially considering the FOID Act is one of the only laws of its kind. The State attempts to counter such a conclusion by arguing "there is no constitutionally relevant difference between a shall-issue license regime for public carry and the FOID Act. Because the FOID Act functions the same way as shall-issue licensing regimes permitted by *Bruen*, it is constitutional for the same reasons." No, it does not function in the same way. The FOID Act precludes all firearm acquisition or possession, while the "shall issue" regimes to which the *Bruen* Court referred involve the historically regulated right to public carry. The State bases its argument on the premise that "*Bruen* held that the Second Amendment does not make a distinction between the public and home," citing *Bruen*, 597 U.S. at 32-33 (majority opinion). I disagree with the State's logic for two reasons. First, *Bruen* did not hold there is no distinction between having a firearm in public versus the home. Although the Court observed "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms" (*Bruen*, 597 U.S. at 32), the observation came in a specific context. The Court made this statement when finding the second amendment's plain text

covered the petitioners' desired conduct, namely the public carry of firearms. See *Bruen*, 597 U.S. at 31-33. By referencing the "keep and bear" language, the Court simply observed the second amendment's text sets wide contours—it protects conduct at home and in public. See *Bruen*, 597 U.S. at 31-33. The Court mentioned the second amendment's lack of distinction between the home and public in the context of the broad conduct protected by its text, rather than during its historical analysis.

¶ 166        Second, the State cannot broadly regulate a right simply because the second amendment broadly codifies it. The State cannot do so with other constitutional rights. On the contrary, when means-ends scrutiny applies, legislation regulating constitutional rights must be narrowly tailored due to the fundamental nature of those rights. While the State can impose restrictions on carrying a firearm in public, it does not logically follow that similar restrictions can equally apply to possessing a firearm in one's home because the second amendment codified the right to keep *and* bear arms. Such a viewpoint emphasizes text over history. As I will discuss further, our nation has a history and tradition of regulating the public carry of firearms but no relevant history of a complete ban on firearm possession in every form precedent to governmental approval. Once conduct is covered by the second amendment, the textual analysis ends, and we turn to history and tradition.

¶ 167        I suggest *Bruen*'s footnote nine did not sanction all shall-issue licensing regimes as constitutional. This conclusion is borne out by the United States Supreme Court's other second amendment jurisprudence, where it faithfully conducted a text and history analysis and arrived at limited holdings, clearly delineating what it was and was not deciding. See *Heller*, 554 U.S. at 627-28, 632, 635 (deciding only the District of Columbia's law banning handgun possession in the home, not addressing licensure requirements and not casting doubt on long-standing prohibitions

on felons and the mentally ill, possessing guns in sensitive places, and commercial sale); *McDonald*, 561 U.S. at 790 (deciding only the incorporation question); *Rahimi*, 602 U.S. at 700 (deciding only that the second amendment permits a person to be temporarily disarmed if that person has been found by a court to pose a credible threat to the safety of another). Recall, second amendment jurisprudence is still emerging from its beginning stages since *Heller*'s dramatic shift. See *Rahimi*, 602 U.S. at 736 (Kavanaugh, J., concurring). It makes little sense to interpret *Bruen*'s footnote nine broadly when the Court has issued narrow holdings when provided the opportunity to expound on the second amendment this century. Accordingly, we should not stretch footnote nine, which solely addresses public carry laws, to cover the question presented to us today. In his *Rahimi* concurrence, Justice Gorsuch reminded the bench and bar, "As this Court has long recognized, what we say in our opinions must 'be taken in connection with the case in which those expressions are used,' [citation], and may not be 'stretch[ed]…beyond their context.' " *Rahimi*, 602 U.S. at 713-14 (Gorsuch, J., concurring). To do so here would be to give specific, clearly defined language a completely different and expanded meaning.

¶ 168        Clearly, then, footnote nine is limited to public carry laws. The *Bruen* Court did not sanction the FOID Act when it approvingly cited the Firearm Concealed Carry Act (430 ILCS 66/10 (West 2022)). And there is no historical analysis in footnote nine—it contains limiting language intended to prevent a barrage of cases challenging shall-issue public carry laws based on a proper cause may-issue case.

¶ 169        I also note the State relies on the Fourth Circuit's decision in *Maryland Shall Issue, Inc.*, 116 F.4th 211, to support its argument the FOID Act is presumptively lawful under *Bruen*'s footnote nine. But that court bypassed the *Bruen* analysis, something the Seventh Circuit stated we cannot do. See *Atkinson*, 70 F.4th at 1022 ("Nothing allows us to sidestep *Bruen* in the way the

government invites."). Likewise, the majority agrees the FOID Act's "shall issue" regime differs from the "shall issue" regimes addressed in *Bruen* and relies on *Maryland Shall Issue, Inc.*, to justify "advance permission regulatory schemes." But again, the *Maryland Shall Issue, Inc.*, court dealt with a limited restriction, *i.e.*, a handgun qualification license preceding the purchase of a handgun, not a complete prohibition to the purchase of any firearm or ammunition. See *Maryland Shall Issue, Inc.*, 116 F.4th at 216-17. Moreover, "[w]e must undertake the text-and-history inquiry the [Supreme Court] so plainly announced and expounded upon at great length." *Atkinson*, 70 F.4th at 1022. In determining *Bruen*'s analysis is indispensable to deciding a second amendment challenge, the Seventh Circuit, like the Supreme Court, observed there is much left unsettled in second amendment jurisprudence. See *Atkinson*, 70 F.4th at 1022-23 (noting *Bruen* left unresolved the "complicated issue" of whether the second amendment's plain text covers felons). Though not bound by Seventh Circuit precedent, "we may afford a Seventh Circuit decision more persuasive value than we would the decisions of other federal courts, provided it is reasonable and logical." *State Bank of Cherry v. CGB Enterprises*, *Inc.*, 2013 IL 113836, ¶ 53. Because I find the Seventh Circuit's *Atkinson* decision reasonable and logical and a proper extension of the restrained approach the United States Supreme Court has taken thus far, I find its decision more persuasive in Illinois law compared to a Fourth Circuit opinion. We should heed the *Atkinson* court's guidance and properly apply *Bruen*.

¶ 170        Finally, the majority further misapplies *Bruen* by comparing the language of other "shall issue" statutes with the FOID Act as justification. Such a comparison misses the point, as we must compare the challenged statute with historical analogues evincing a tradition of firearm regulation or find it consistent with the principles that underpin our regulatory tradition. We cannot compare two modern day regulations for historical compatibility under the second amendment.

For all these reasons, I do not agree with the majority's view that footnote nine offers "important guidance for evaluating the parties' claims" here. *Supra* ¶ 32.

¶ 171    All told, the State's argument that *Bruen* approved all shall-issue regimes, including the FOID Act, is unpersuasive and contrary to the foundational premise upon which the *Bruen* test rests. When evaluating restrictions on the preexisting right codified by the second amendment, we must recognize "the inherent right of self-defense has been central to the Second Amendment right." *Heller*, 554 U.S. at 628. As the Supreme Court said in *Heller*, "We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581. "The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' " *Heller*, 554 U.S. at 592. As such, the right is presumptively protected, and the State's obligation is not to show the similarity between the broadness of the right and the broadness of the regulation but to show the challenged regulation is consistent with the principles underpinning our regulatory tradition and does not act to infringe on the second amendment. See *Rahimi*, 602 U.S. at 692. We must remember it was the broad scope of the challenged restrictions in *Heller* and *Bruen* that the Supreme Court found damning when compared to the all-inclusive right all citizens have to armed self-defense.

¶ 172    4. *The FOID Act Is Inconsistent With America's*

*Historical Tradition of Firearm Regulation*

¶ 173    The State points to three categories of laws as being "relevantly similar" analogues to the FOID Act. Specifically, the State directs our attention to (1) disarmament laws, such as those disarming anyone who refused to swear an oath of allegiance, and surety laws, like those discussed above; (2) colonial militia-training laws; and (3) various nineteenth-century laws addressing the

registration and taxation requirements of certain firearms. The State contends that, collectively, these laws share a comparable burden to Illinois's FOID card requirement because they establish the founding generation understood dangerous or untrustworthy people could be disarmed and the states could regulate firearm ownership through certification, registration, and taxation. Further, the State argues these laws, like the FOID Act, share a comparable justification, in that they were enacted to promote public safety and keep the peace.

¶ 174        Having found the FOID Act implicates the second amendment's plain text, the State must now carry its burden to "justify [the FOID Act] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. As discussed, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Even though the law "must comport with the principles underlying the Second Amendment, *** it need not be a dead ringer or a historical twin." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 692. "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29 n.7). This is necessary because of the scope of the *preexisting* right codified by the second amendment. As Justice Gorsuch observed in his *Rahimi* concurrence, "When the people ratified the Second Amendment, they surely understood an arms-bearing citizenry posed some risks. But just as surely, they believed that the right protected by the Second Amendment was itself vital to the preservation of life and liberty." *Rahimi*, 602 U.S. 709 (Gorsuch, J., concurring). "Why and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692 (majority opinion).

"For example, if laws at the founding regulated firearm use to address particular

problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692.

On the other hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. In this case, the State claims the FOID Act addresses a general societal problem in that it promotes public safety and keeps the peace by controlling the acquisition and possession of firearms. I challenge my colleagues to point to one historical analogue similar to the FOID Act in its total prohibition against the acquisition and simple possession of firearms, with no claim of known or suspected dangerousness or status in a group otherwise prohibited from possessing firearms.

¶ 175        Here, the State attempts to justify the FOID Act by arguing it is relevantly similar to (1) disarmament laws, such as those that disarmed individuals who refused to swear oaths of allegiance, and surety laws; (2) colonial militia-training laws; and (3) various nineteenth-century laws related to the registration and taxation requirements of certain firearms. I address each of the State's proffered analogues in turn.

¶ 176                              a. Loyalty-Oath and Surety Laws

¶ 177        In support of their arguments, the State and the special concurrence contend the FOID Act shares a comparable burden ("how") and justification ("why") (see *Bruen*, 597 U.S. at 29-30) to historical disarmament laws that confiscated firearms from those considered "dangerous

or unvirtuous," specifically those unwilling to swear oaths of allegiance. The State makes the same argument with regard to surety laws that required certain individuals to post a bond to carry firearms in public. For instance, during the Seven Years' War, from 1756 to 1763, Maryland, Pennsylvania, and Virginia enacted measures disarming Catholics out of fear that Catholics owed fealty to a foreign higher power. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 258-59, 263 (2020). In 1776, with the American Revolution imminent, Massachusetts enacted a law "to cause all persons to be disarmed within their respective colonies who are notoriously disaffected to the cause of America." (Internal quotation marks omitted.) Greenlee, *supra*, at 264. Pennsylvania enacted a similar measure one year later, disarming entire groups of people, particularly Quakers, whose status purportedly suggested they could not be trusted to abide by the law. Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006). That same year, Virginia followed suit and disarmed "all free born male inhabitants *** above the age of sixteen years" who refused to swear " 'allegiance and fidelity' " to the government. Hening, *supra*, at 281.

¶ 178        Fast forward to the mid-nineteenth century, when surety laws were adopted across several jurisdictions to address the public carrying of weapons by individuals considered likely to breach the peace. *Bruen*, 597 U.S. at 55. Massachusetts pioneered this approach, implementing a law in 1836 that required individuals carrying weapons without a reasonable cause for self-defense to post a bond if others had a valid fear of harm from them. *Bruen*, 597 U.S. at 55-56. This model spread to other states, but those laws did not amount to outright prohibitions on public carry and said nothing about the right to acquire or possess firearms at all. Rather, they assumed individuals had the right to carry publicly and only imposed conditions on those believed to pose a specific

risk to public order. See *Bruen*, 597 U.S. at 55. But "[b]efore the accused could be compelled to post a bond," a person with "reasonable cause to fear that the accused would do him harm or breach the peace" had to make a complaint to the judicial authority, who would hear evidence and allow the accused an opportunity to respond. (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 696-97. These surety statutes were applied narrowly and allowed individuals to carry firearms publicly without penalty, so long as they posted bond when reasonably accused of intending harm. *Bruen*, 597 U.S. at 56-57. If the party from whom surety was demanded refused to post a bond, he or she would be forbidden from carrying a weapon in public absent special need. See *Bruen*, 597 U.S. at 56-57; *Rahimi*, 602 U.S. at 697 ("Bonds could not be required for more than six months at a time, and an individual could obtain an exception if he needed his arms for self-defense or some other legitimate reason.").

¶ 179          According to the State and the special concurrence, historical disarmament laws are well established and representative historical analogues to the FOID Act. First, they contend the FOID Act imposes a comparable burden to loyalty-oath laws by prohibiting the possession of firearms only if an individual is deemed dangerous or is otherwise disqualified. See 430 ILCS 65/8 (West 2022). They both argue the justification for the FOID Act mirrors that of these laws because it was enacted "to promote and protect the health, safety and welfare of the public," (430 ILCS 65/1 (West 2022)), just as loyalty-oath laws were enacted to promote public safety.

¶ 180          As for the surety laws, the State contends the FOID Act similarly burdens a person's second amendment right to keep and bear arms because it seeks to advance public safety by disarming individuals who pose a credible threat based on objective criteria. In the State's view, the FOID Act, like historical surety statutes, presumes individuals will be issued a FOID card unless they fall into a specific category, such as those who demonstrate a likelihood to breach the

peace. However, Justice Gorsuch's concurrence in *Rahimi* warns us that, when making these historical comparisons, "a court may not extrapolate from the Constitution's text and history the values behind [that right], and then ... enforce its guarantees only to the extent they serve (in the courts' views) those underlying values." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. at 710 (Gorsuch, J., concurring). He explained, "Courts must proceed with care in making comparisons to historic firearm regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Rahimi*, 602 U.S. at 711 (Gorsuch, J., concurring). I do not find regulations requiring evidence of a credible threat or a refusal to swear an oath of loyalty *before* divesture of their preexisting right to keep and bear arms to be "relevantly similar" to the FOID Act's requirement that all citizens are required to prove the absence of any prohibiting factors or circumstances *before* exercising that right. *Bruen* observed there was little historical evidence authorities enforced surety laws, asserting, "The only recorded case that we know of involved a justice of the peace *declining* to require a surety, even when the complainant alleged that the arms-bearer did threaten to beat, wou[n]d, mai[m], and kill him." (Emphasis in original and internal quotation marks omitted.) *Bruen*, 597 U.S. at 58. *Bruen* also noted a scholarly search of nineteenth-century newspapers revealed the only other examples "involv[ed] black defendants who may have been targeted for selective or pretextual enforcement." *Bruen*, 597 U.S. at 58. *Bruen* found such an analogue "surely too slender a reed on which to hang a historical tradition of restricting the right to public carry." *Bruen*, 597 U.S. at 58. The same would be true for the FOID Act's preemptory prohibition against the basic right to keep firearms.

¶ 181    Regarding colonial loyalty-oath laws, I question whether laws disarming "disloyal" groups of people can be considered as defensible analogues to the FOID Act. After *Rahimi*, it would be dubious to rely on historical laws that would be found unconstitutional today, such as

those prohibiting individuals from possessing firearms based on race, religion, or political persuasion. See *Rahimi*, 602 U.S. at 694; *Heller*, 554 U.S. at 594-95, 600-03. As the Court said, "By the time of the founding, \*\*\* state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." *Rahimi*, 602 U.S. at 694. Justice Kavanaugh's concurrence reinforced that conclusion, saying, "The Framers drafted and approved many provisions of the Constitution precisely to depart from rather than adhere to certain pre-ratification laws, practices, or understandings." *Rahimi*, 602 U.S. at 720 (Kavanaugh, J., concurring). But beyond the modern-day unconstitutionality of such restrictions, loyalty-oath laws cannot serve as appropriate analogues to the FOID Act because their purpose for disarming "disloyal" groups was ostensibly to preserve the political and social order during *wartime*. See Greenlee, *supra*, at 261 ("While public safety was a concern, most disarmament efforts were meant to prevent armed rebellions."). Their targeted use also suggests these measures had a negligible impact on the right to keep and carry weapons in general. See Greenlee, *supra*, at 265 ("[A]s was the case with all disarmaments during the colonial period, the justification was always that those being disarmed were dangerous."). Without more evidence these wartime measures were meant to align with the constitution's usual application during peacetime, they carry little weight. See *Bruen*, 597 U.S. at 63 n.26. Given their narrow application, the fact that colonial governments targeted and disarmed certain groups of people they distrusted offers little support for modern, comprehensive restrictions like the FOID Act, which imposes sweeping limitations on possessing firearms. See 430 ILCS 65/2 (West 2022).

¶ 182          Second, the FOID Act fundamentally differs from the disarmament laws upon which the State relies because it restricts a far broader group from possessing firearms compared to the smaller, specific groups of suspicious, dangerous, or untrustworthy individuals historically

subject to long-term disarmament. Most notably, the FOID Act does not identify categories of disqualified people before imposing restrictions. Instead, it forbids *everyone* in Illinois from possessing a firearm until they "[s]ubmit evidence" that they do not fall within an unacceptable class and are issued a FOID card. See 430 ILCS 65/2(a)(1), 4(a)(2) (West 2022). This is no small difference. The common denominator found in each of the State's analogues within this tradition is that they addressed circumstances under which a law-abiding citizen could be *disarmed* or divested of their preexisting right to be armed in the first place. But the FOID Act, by preemptively depriving all citizens of firearms to keep those firearms out of dangerous or otherwise unsuitable hands, operates in a meaningfully different way that extends far beyond historical disarmament regulations like colonial loyalty-oath laws and surety statutes. See *Rahimi*, 602 U.S. at 692. More importantly, this functional difference is precisely what the United States Supreme Court criticized as unconstitutionally broad in potential analogues within this exact tradition. I would note, in this instance, the majority does not actually tell us which disarmament laws identified by the State are relevantly similar to FOID.

¶ 183     In *Bruen*, the Supreme Court determined New York's licensing regime was not analogous to historical surety laws because the two sets of laws worked in meaningfully different ways. "While New York presumes that individuals have *no* public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of reasonable cause to fear an injury, or breach of the peace." (Emphases in original and internal quotation marks omitted.) *Bruen*, 597 U.S. at 56. Next, *Rahimi* examined how surety and "going armed" laws operated at our nation's founding, along with reviewing their purpose to discern a tradition of temporarily disarming those found by a court to present "a clear threat of physical violence to another." *Rahimi*,

602 U.S. at 698. Ultimately, the Supreme Court determined the challenged section of the United States Code was relevantly similar to these laws because they all presumed "that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. The majority does not tell us how the surety laws referenced by the State are relevantly similar to the FOID Act, other than to say they both have preventative aims. See *supra* ¶ 39.

¶ 184    The point is that different mechanisms often impose different burdens. The Supreme Court in both *Bruen* and *Rahimi* found it determinative that disarmament laws were aimed at those who were already deemed dangerous and used this as the basis for comparing present-day restrictions. In this case, the historical disarmament laws the State cites as allegedly supporting a tradition of prohibiting dangerous or untrustworthy people from possessing firearms all function the same way—by targeting certain groups of supposedly dangerous or untrustworthy people and penalizing them for failing to surrender their firearms or prove they were not unqualified to possess weapons. But this is markedly different from how the FOID Act works. Instead, the FOID Act treats *everyone* as presumptively unqualified to possess a firearm until they "[s]ubmit evidence" that they are safe and responsible. See 430 ILCS 65/4(a)(2) (West 2022). Historical disarmament laws imposed no such restraint. See *Rahimi*, 602 U.S. at 692. Thus, I cannot say the FOID Act is relevantly similar to historical disarmament laws, such as colonial loyalty-oath and nineteenth-century surety laws, as they do not share comparable burdens. Remember—"how and why the regulations burden a law-abiding citizen's right to armed self-defense" is significant because "individual self-defense is the *central component* of the Second Amendment right." (Emphasis in original and internal quotation marks omitted.) *Bruen*, 597 U.S. at 28-29; *Rahimi*, 602 U.S. at 692.

¶ 185                                    b. Militia Laws

¶ 186        Next, the State argues the FOID Act is justified by a historical tradition of laws requiring training for members of the militia, citing several colonial militiatraining laws as support. But this argument is unavailing because militia-training laws placed no restrictions on acquiring or owning firearms. While many of them generally required members of the militia to provide their own weapons and show up for routine training, colonial militia-training laws never conditioned keeping or bearing arms on participation in militia training. For instance, a Massachusetts law enacted in 1757 required "that every person from the age of sixteen to sixty, not exempted by law, shall appear with arms and ammunition according to law, and attend his duty each of the aforesaid days." 1757 Mass. Acts 51. In 1778, New Jersey enacted a law requiring militia members to "assemble, properly armed and accoutered, twice in the Year, at such Times and Place or Places as the Field-Officers, or a Majority of them, shall direct for the Purpose of Training and Exercise." 1778 N.J. Laws 42. The law imposed monetary sanctions based on the absentee's rank "in case of absence" and sanctioned any militia member who failed to acquire the proper arms and ammunition. See 1778 N.J. Laws 45. Connecticut also enacted a law in 1799 penalizing militia members who "neglect[ed] to appear at the Time and Place appointed for regimental or battalion exercise" and fined militia members "for deficiencies of Arms, Ammunition and Accoutrements required by Law." 1799 Conn. Acts 511 (Reg. Sess.).

¶ 187        These examples illustrate clearly why historical militia-training laws are not suitable analogues for the FOID Act, as it was one's membership in the militia that subjected them to the training requirements imposed by early militia-training laws, not their ownership of firearms. The obligation to muster applied whether they owned a weapon or not. In fact, many of these laws required militia members to acquire their own arms, ammunition, and equipment, whereas the

FOID Act broadly restricts a person's ability to do so. Further, a militia member could not avoid a training obligation by getting rid of his weapon, and he would be punished if he did. See 1738 Va. Acts 21 (fining militia members "five shillings, or fifty pounds of tobacco, \*\*\* for not appearing at muster, compleatly armed and accoutered"). Also, mere gun ownership did not obligate someone to train with the militia. Women and elderly persons who owned firearms did not need to appear for training. Historical militia-training laws did nothing to regulate the keeping or bearing of arms. As a result, they cannot buttress the constitutionality of Illinois's FOID card requirement, which, unlike these laws, regulates second amendment freedoms. See *Bruen*, 597 U.S. at 28-29 ("[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." (Internal quotation marks omitted.)).

¶ 188                                c. Nineteenth-Century Laws

¶ 189          Finally, the State contends the principles underlying the FOID Act are relevantly similar to several nineteenth-century laws that applied to firearm owners, such as registration and taxation requirements. The State attempts to piece together a patchwork of unrelated regulations designed for different reasons in an effort to create the appearance of a historical "tradition" similar to the FOID Act. Specifically, in 1821, Maine passed a law requiring that all firearms be marked and numbered, with a certificate to issue to the individual for each firearm. See 1821 Me. Laws 685. In the 1850s, North Carolina enacted a law requiring "every pistol, except such as are used exclusively for mustering," that was "used, worn or carried" to be taxed. 1856-1857 N.C. Sess. Laws 34. And in 1893, Florida passed a law prohibiting the possession of a repeating rifle without a license. See 1893 Fla. Laws 71-72. According to the State, these mid-to-late nineteenth-century laws serve as relevantly similar analogues to the FOID Act because they, like the FOID Act,

similarly burden the second amendment right to keep and bear arms by requiring individuals to obtain proper authorization before possessing firearms and pay taxes on the firearms that they possess. The State also argues these laws share a similar justification with the FOID Act because they all seek to advance public safety.

¶ 190    "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " *Bruen*, 597 U.S. at 28-29 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). "And because '[e]verything is similar in infinite ways to everything else,' [citation], one needs 'some metric enabling the analogizer to assess which similarities are important and which are not.' " *Bruen*, 597 U.S. at 29 (quoting Frederick Schauer & Barbara A. Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017)).

¶ 191    While all firearm restrictions may seek to advance the public safety, the relevant question is whether there is a historical tradition for their existence and scope. The "why" may be acceptable; the "how" is what must be viewed from the lens of the founders' intentions for the second amendment. When discussing the recognizably more regulated right of public carry, *Bruen* warned, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." (Emphasis and internal quotation marks omitted.) *Bruen*, 597 U.S. at 29.

¶ 192    A total ban of all firearms may "seek to advance public safety," but there is no historical analogue to which the State may point to justify a claimed tradition. The State is effectively "gaming away an individual right the people expressly preserved for themselves in the Constitution's text" (*Rahimi*, 602 U.S. at 711 (Gorsuch, J., concurring)) by couching their

justification for the FOID Act in the broad language of advancing public safety. But the FOID Act's purpose is found in its text: "[T]o provide a system of identifying persons who are not qualified to acquire or possess firearms, firearm ammunition ***." 430 ILCS 65/1 (West 2022). That is the "why." To implement this "why," the State has placed a barrier between law-abiding citizens and their second amendment rights, requiring *them* to prove they are not otherwise prohibited from acquiring or possessing a firearm. That is the "how," and it is not "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. From *Heller* to *Rahimi*, the Supreme Court has repeatedly emphasized "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.' " *Rahimi*, 602 U.S. at 690 (quoting *McDonald*, 561 U.S. at 778). Nothing about the process of obtaining a FOID card resembles the claimed nineteenth-century historical analogues or the "central component" of the second amendment, namely the right to own firearms. "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risk[s] endorsing outliers that our ancestors would never have accepted." (Internal quotation marks omitted.) *Bruen*, 597 U.S. at 30. The FOID Act is such an outlier.

¶ 193    "[L]icensing regimes and registration requirements are not the same thing, as each serves a different purpose." *Herrera v. Raoul*, 670 F. Supp. 3d 665, 679 (N.D. Ill. 2023). By monitoring the sale and transfer of guns, registration requirements make it more difficult for illegal trafficking to occur. See Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017) ("Arms and ammunition trafficking was *** a concern as early as the seventeenth century ***."). Additionally, "the founding generation endured mandatory gun registration as a basis for ensuring a functional militia" and "appreciated that weapons were to be regulated, often registered." Meg Penrose, *A Return to the*

*States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483, 1485 (2014). More practically, if a registered gun is stolen, the registration helps in its return to the rightful owner once recovered.

¶ 194　　　The nineteenth-century registration laws identified by the State only burdened the transfer of firearms or required the registration of certain *types* of firearms. However, a licensing regime like the FOID Act burdens an individual's right to keep arms much differently by broadly restricting *everyone* from acquiring *any* firearms without first showing they are suitable to possess them and being issued a FOID card. See 430 ILCS 65/2(a)(1) (West 2022). The burdens imposed by these nineteenth-century laws are in no way "relevantly similar" to those imposed by the FOID Act. See *Bruen*, 597 U.S. at 29. Accordingly, because the nineteenth-century laws put forth by the State do not share "a comparable burden on the right of armed self-defense" with the FOID Act, they cannot serve as representative historical analogues to justify the FOID Act's broad restrictions on a person's right to keep and bear arms. *Bruen*, 597 U.S. at 29.

¶ 195　　　　　　　　　　　　　D. Conclusion

¶ 196　　　GSL challenged the FOID Act as unconstitutional on its face—a high hurdle, to be sure. *Burns*, 2015 IL 117387, ¶ 27. GSL cleared it. Meeting *Bruen*'s standard, GSL showed that acquiring and/or possessing firearms is conduct covered by the second amendment's plain text and our nation does not have a history or tradition of such broad, sweeping restrictions on that conduct. Because the State failed to establish that the FOID Act falls in line with our history and tradition of firearm regulation, it has not shown a set of circumstances in which the FOID Act is valid. If a firearm restriction has no analogue in our history, meaning a relevantly similar law has never been constitutionally imposed, then there is no set of circumstances where that law can be constitutionally applied now. Recall *Bruen*'s observation that, "when a challenged regulation

addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. The State argued the FOID Act addresses society's need to keep firearms out of dangerous hands—a societal problem dating back to this nation's founding and before. Yet, the State has not provided a similar historical analogue addressing that problem by broadly prohibiting firearm acquisition and possession by anyone in the State of Illinois. Accordingly, the State failed to refute GSL's facial challenge.

¶ 197        In sum, as stated in *McDonald*, "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. [The State], in effect, ask[s] us to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780. The State points to no relevantly similar historical analogue showing the preemptive restriction imposed by the FOID Act "is consistent with the Nation's historical tradition of firearm regulation." (Internal quotation marks omitted.) *Rahimi*, 602 U.S. 689. Neither the majority nor the special concurrence does any better. Further, the FOID Act effectively stands the second amendment on its head, reversing the exercise of the right as it has been known historically. Although the acquisition and possession of firearms, as regulated by the FOID Act, are clearly contained within the constitution's text and consistent with our history of firearm ownership, and are therefore presumptively protected, Illinois requires the holder of the constitutional right to prove they are not a person otherwise subject to a restriction or prohibition *before* they may exercise that right. All the historical analogues argued by the State or examined by the United States Supreme Court in this context recognized the preexisting right, which either through status,

conduct, or circumstances, the government could demonstrate was subject to restriction. The founders understood almost everyone had the right to keep and bear arms, unless and until there was some basis for removal. The FOID Act presumes no one has the right to keep and bear arms, unless and until the right holder proves otherwise. This is the definition of unconstitutional.

¶ 198        For the reasons stated, I would find the FOID Act facially unconstitutional and, as a result, see no need to address the fees issue.

*Guns Save Life, Inc. v. Kelly*, 2025 IL App (4th) 230662

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 19-CH-180; the Hon. Jennifer M. Ascher, Judge, presiding. |
| **Attorneys for Appellant:** | Andrew A. Lothson and Benjamin D. Lothson, of Swanson, Martin & Bell, LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Kaitlyn N. Chenevert, Assistant Attorney General, of counsel), for appellee. |